T.C. Memo. 2009-245


UNITED STATES TAX COURT


DAVID J. FELT AND SHARON A. FELT, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3735-06.                    Filed October 28, 2009.


George W. Connolly and Habeeb Gnaim, for petitioners.

Randy Durfee and Gordon Sanz, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  David Felt, a real-estate broker and mortgage banker, bought a Texas savings-and-loan association in 1983.  It was failing, and regulators wanted him to sell.  To make matters worse, David and his wife Sharon failed to file their tax returns

for 1986-87, 1989, and 1994-98.  The Commissioner says their
failure to file concealed massive amounts of income, including:

!    $4 million in capital gains from the sale of the S&L,

!    $2 million in cancellation-of-indebtedness income from a
     different business that David also ran, and

!    a small river of money streaming to the Felts through
     accounts held by David's aged mother and flowing from
     indistinct sources offshore.

The Commissioner also asserts various additions to tax, and
resists Sharon Felt's request for innocent-spouse relief.

FINDINGS OF FACT

I.  Beginnings: Reliance Savings Association

David Felt bought Bowie County Savings & Loan Association in
1983.  He financed the deal with $1.4 million borrowed from the
Texas Investment Bank and from an entity called American Guaranty
Inc. (AGI), which he himself owned.  Felt moved Bowie to Houston
and renamed it Reliance Savings Association.  Reliance was a
state-chartered, federally insured S&L regulated by the Federal
Home Loan Bank Board (FHLBB).

S&Ls became popular in the early twentieth century as a way
to promote home ownership.  Kendall, The Savings and Loan Business
1 (1962).  They offered slightly higher interest rates on savings
accounts than could some banks, and then used the savings to fund
residential mortgages.  For much of the century, S&Ls enjoyed tax
benefits but also shouldered a heavy regulatory weight--for
instance, a majority of their assets had to be residential real-

estate loans.  In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96-221, sec. 401, 94 Stat. 151, which loosened restrictions on consumer lending and broadened the types of investments thrifts could make.  Volatile interest rates, a mismatch of short-term government-insured liabilities and long-term risky investments-- plus some outright thievery--led to a financial crisis in the industry when borrowers defaulted at staggering rates.  Hundreds of S&Ls failed, and Texas was especially hard hit, partly due to sagging real estate prices; Felt himself estimated that nearly 75% of the S&Ls in the state failed or disappeared in the 1980s.

Reliance was one of them.  In 1986, the FHLBB came after Felt for regulatory violations, and threatened him with removal and a cease-and-desist order.  Felt took the hint and, in August 1986, agreed to sell his entire interest in Reliance.  The Bank Board gave him six months, and warned him to come to the Board for approval of any deal that he worked out.

Felt quickly found a consortium of buyers.  They fell into three groups.  The first were people who had lent money to AGI and gotten notes back; Felt traded 60 percent of his Reliance stock for the return of these notes.  The second group paid him $500,000 in cash for 7 percent of the Reliance stock, but borrowed the money from a bank which required Felt to personally guarantee the loan.  And a third group bought the remaining 33 percent with

notes from yet another of Felt's business entities, called Specialty Finance Company, which held the shares as collateral.

The deal was trouble from the start.  Felt's offering material included unaudited financial statements and failed to include some information that it should have.  The deal also depended on anticipated sales to affiliates that were less than certain to occur.  Felt didn't fix these problems and the FHLBB never approved the sale.

But Felt went ahead with the deal anyway.  The FHLBB's response was swift and harsh.  It seized Reliance, and in 1990 it got a judgment against Felt requiring him to rescind the sale.  This left him to pay a judgment for $4.2 million plus costs and interest.  The Felts declared bankruptcy in 1992, but even bankruptcy turned sour in 1997 when the Office of Thrift Supervision, the FHLBB's successor agency, won a court order declaring the $4.2 million judgment nondischargeable because it arose from Felt's willful defalcation and breach of fiduciary duty.

## II.  Life After Bankruptcy

The Felts both testified that life became grim.  David said they had had an A+ lifestyle before mid-1987, which gradually became an F lifestyle.  Sharon credibly testified that she and her husband could no longer afford a housekeeper or a landscaping company after 1992.  We also believed her testimony that they

could no longer afford new furniture and began instead to accept used furniture handed down from her elderly mother-in-law, Birdie Felt.

It wasn't just furniture that Birdie was giving the Felts. By 1994, and until her death in 2000, many of the Felts' ordinary household expenses came to be paid from Birdie Felt's checking account. Tens of thousands, and perhaps hundreds of thousands, of dollars a year for rent, summer camp, college expenses, and credit-card bills came to the Felts from her account. She also deposited money into several of David's business accounts.

The source of her plentiful wealth is unclear. But whatever its ultimate origins, it flowed from offshore accounts back to the United States in regular $7,500 wire transfers. These wire transfers continued uninterruptedly until March 2000, several months before Birdie died. We specifically find that at least some of her wealth came from her son; for 1995 through 2000, the bank records of Tower Resources (yet another of David's many businesses) show almost $40,000 flowing to Birdie.

III.  AGI and AGI-Nev

Reliance was only one province of Felt's empire in the '80s. Another was AGI, a Texas corporation that Felt had formed in 1978, and which later was to become entangled in the Reliance sale. As Felt's troubles grew, he began to fail to pay AGI's franchise tax, and its registration lapsed in November 1989. Before then,

though, AGI was in the consumer and residential loan business, which it funded by borrowing money from investors. AGI's importance to this case lies in the notes with a face value of $2,510,740 that some of its investors exchanged for Reliance stock in 1986.

But there was also another AGI. In 1998, Felt applied for an Employer Identification Number for "American Guaranty, Inc." in Las Vegas, Nevada (we'll limit our use of the abbreviation AGI to the Texas corporation, and call this one AGI-Nev). Felt listed his aged mother as AGI-Nev's principal officer. He described it as a "holding company" and indicated that "American Guaranty, Inc." had never applied for an EIN before. (AGI-Nev is also defunct, Nevada having permanently revoked its registration.)

AGI-Nev is important to the case because David and Birdie opened at least two bank accounts in its name. The first was a checking account, into which they deposited $50,000. The second was a money-market account, into which they deposited $250,000. Felt explained this by saying that he had given some old AGI (that's the by-then-defunct Texas AGI, not AGI-Nev) receivables to a collections company, and that he formed the new company to handle the money it remitted. Felt testified that, despite the corporate facade, he and Birdie used the AGI-Nev money personally and may have split it equally. There are several checks bearing Birdie's signature from the AGI-Nev accounts. One check, written

in February 1999, is for $17,048.39 and was endorsed by David Felt.  The others, from 1998, total $55,000 and were endorsed for deposit into Birdie's Wells Fargo account.

## IV.  J&N

A third entity important here is J&N (the initials of the Felt children).  J&N was not a corporation; Felt described J&N as "effectively a d/b/a that just held some rental properties and a couple of notes or something."  It did, however, have a bank account in its own name, and at least $153,000 somehow stumbled into this account in 1997.  The source of the money is also mysterious--Felt says that J&N took in only $80,000 that year by collecting an old debt, and after expenses it netted only $73,118.

## V.  Notices of Deficiency

In 2005, the Commissioner issued notices of deficiency to the Felts.  They showed the following deficiencies in tax:[1]

---

[1] There is no explanation in the record for the different deficiencies for the two Felts in 1987 and 1996.

| Year | Deficiency |
|------|------------|
| 1986 | $991,690 |
| 1987 | David:   103,859<br>Sharon: 103,084 |
| 1989 | 561,884 |
| 1994 | 36,732 |
| 1995 | 10,632 |
| 1996 | David:    37,102<br>Sharon:   37,779 |
| 1997 | 144,567 |
| 1998 | 185,864 |

The Commissioner also asserted additions to tax under sections 6651(a)(1) and (2) and 6654.[2]  We tried the case in Houston, as the Felts were Texans when they filed their petition.

OPINION

The parties settled many issues, but these remain:

! Whether David and Sharon Felt should have reported capital gains for 1986 from the sale of Reliance;

! whether they should have reported $2 million in cancellation-of-indebtedness income for 1989;

! whether they should have reported income from Birdie Felt for 1996, 1997, and 1998;

! whether they should have reported $153,118 in income from J&N for 1997;

! whether they should recognize $300,000 in income from AGI-Nev for 1998;

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code for the years at issue; all Rule references are to the Tax Court Rules of Practice and Procedure.

! whether Sharon Felt is entitled to relief from community property liability rules under section 66; and

! whether the Commissioner properly asserted additions to tax and a penalty against her.

I. Income from the Sale of Reliance

A. Did David Recognize Gains from the Reliance Sale?

To calculate gain, we subtract a taxpayer's adjusted basis from the sale price of the item sold. Sec. 1001(a). The parties agree that Felt's basis in his Reliance stock was $1,725,852. Felt says he sold his shares for assets nominally worth $4.5 million. But simple arithmetic will not do here, because the parties dispute the actual value of what Felt got for his shares. We therefore value each piece of what he got:

! the AGI notes,

! the borrowed cash supported by Felt's guaranty, and

! proceeds from the Specialty Finance loans.

1. AGI Notes

David exchanged about 60 percent of his Reliance shares for notes payable by AGI. These notes had a total face value of $2,510,740, but Felt argues that they were worthless. The Commissioner contends that the Felts benefited because they were the sole owners of AGI, and AGI was now free of a $2.5 million debt. Felt does admit that the cancellation of those notes might have created cancellation-of-indebtedness income for him,[3] but

---

[3] Gross income includes "all income from whatever source

(continued...)

argues that this would be true only if he were personally liable for their repayment.  We agree with Felt that we should look first at whether the sale created cancellation-of-indebtedness income for him from AGI, and only then at whether the sale created a gain or loss.

The Commissioner argues that David was personally liable on the investors' notes, got them as part of the Reliance stock sale, and then canceled them, giving rise to $2.5 million of income.  It's not immediately apparent why this should be so--AGI was a corporation, which usually gives shareholders limited liability.  In Texas as elsewhere, a corporation's creditors cannot successfully demand that shareholders pay their company's debts unless the shareholders have guaranteed them.  See Tex. Bus. Corp. Act Ann. art. 2.21 (Vernon 2003).

David provided several pieces of evidence that he had not personally guaranteed the notes or become otherwise personally liable.  First is the letter he sent to AGI investors to induce them to trade for his Reliance stock.  In that letter (of admittedly dubious credibility) he writes:  "Although I, David Felt, do not have any personal liability for payment of your AGI note, and do not assume any liability for payment of your AGI note * * * I will be preparing an offering circular for my stock in

---

[3](...continued)
derived," including income from the discharge of indebtedness.
Sec. 61(a)(12).

Reliance Savings Association." The parties introduced a more persuasive AGI note from October 1984, originally made out to a Tracy V. Huckins, which makes no mention of a personal guaranty by David and seems to allow recourse only against AGI.

The Commissioner's only evidence is a Memorandum and Order from the Southern District of Texas in FHLBB v. Felt, No. H-88-1204 (S.D. Tex. 1997) (order to submit final judgment), which states, "[A]s a result of the exchange, Felt * * * canceled AGI's investment debt, allowing Felt to avoid personal liability for that debt; and allowed Felt to retain AGI's assets for himself and to forgive his personal debt to AGI." The problem for the Commissioner here is that he didn't give us enough context--the District Court's order doesn't explain the basis for its finding. And the Commissioner never pleaded or argued that Felt had actually litigated the question in District Court--and we won't just assume that actual litigation or the other elements of collateral estoppel exist. We therefore find by a bare preponderance of the evidence that David has produced sufficient evidence that he was not personally liable on the notes. He has met his burden of showing that no cancellation-of-indebtedness income accrued to him from the exchange of AGI notes.

That's not quite enough for the Felts to win this part of the case. They must also persuade us that the AGI notes were worthless at the time of the sale. The Commissioner helped them here, presenting evidence from Timothy Wannemuehler, the FHLBB

bank examiner who examined AGI's records in 1986, that AGI was insolvent in 1986, and could not pay the notes. This corroborates Felt's own claim that he himself knew the notes were worthless when he accepted them for his Reliance stock--he sent a letter to AGI's investors about that time to warn them of cashflow problems at AGI and tell them that 90 percent of AGI's competitors were out of business or in bankruptcy. We therefore find that the notes were worthless.

### 2. Cash

Five investors paid Felt a total of $500,000 cash for some Reliance shares. Some of these investors financed their purchase through Texas Investment Bank, which required Felt to personally guarantee the loans. The record has three guaranty agreements for a total of $171,000, all signed by Felt, effective December 1986. All have stated maturity dates of December 31, 1987. Felt does not dispute that he received $500,000 cash in 1986. His only argument is that he later had to make good on some of his guaranties and estimates that he had to pay back $100,000.

He stumbles here on the claim-of-right doctrine, the rule of tax law that states, "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income * * * even though it may still be claimed that he is not entitled to retain the money." N.A. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932). If the taxpayer must later repay, he may take a deduction in the year he repays. Id.; see

also sec. 1341. This means the Felts must report the entire $500,000 as income in 1986, the year they received it.

That still leaves the question of whether the Felts are entitled to a deduction in the year Felt made good on the guaranty (assuming that year is one of the years before us). Felt bears the burden of proving both the amount he repaid and the date he repaid it. See Rule 142(a). He offered only his testimony to prove the amount of the repayment, and no evidence of the date of the repayment. We cannot say when he paid the guaranties or whether he even paid in years covered by the notices of deficiency, so on this point we find for the Commissioner. The Felts must include the entire $500,000 as payment for the Reliance stock in 1986 and they are not entitled to a deduction for the alleged $100,000 repayment.

### 3. Specialty Financing Notes

The final group bought roughly 33 percent of the Reliance stock. They financed this with loans from Specialty Finance, which turns out to be a doing-business-as name for David Felt. These loans were in the form of promissory notes from the stock buyers to Specialty Finance. We have only one note in the record, and it shows interest payable starting in April 1987, with principal payments beginning in April 1989 and the entire note coming due December 31, 1990. The interest rate is set at either the highest rate allowed by law or one percent over the prime rate, whichever was less. It was secured by the Reliance shares.

Felt argues that because he was insolvent, Specialty Finance was insolvent, thus making the notes worthless. His logic is clearly wrong; just because Citibank, for instance, becomes insolvent doesn't mean its credit card holders get off the hook from paying their bills. The relevant inquiry is into the debtor's solvency; if the debtor is solvent, an insolvent creditor may sell the notes for immediate (if discounted) cash value. This is called "cash equivalence."

Individual taxpayers are generally cash basis taxpayers, which means that they have to recognize income in the year they "actually or constructively" receive it. Sec. 451; sec. 1.451-1(a), Income Tax Regs. This rule is easy to apply to cash--cash is income when the taxpayer gets it in his hands. It is harder to apply to debt instruments like promissory notes, which entitle the taxpayer only to a future income stream. We evaluate this kind of consideration for "cash equivalence," and include it in income in the year received, rather than counting it as income only when payments are made. Felt has the burden of proving that the notes are not cash equivalents. See Olster v. Commissioner, 79 T.C. 456, 469 n.14 (1982), affd. 751 F.2d 1168 (11th Cir. 1985). We look at whether the note is a "promise to pay of a solvent obligor * * *, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for

the use of money." See <u>Cowden v. Commissioner</u>, 289 F.2d 20, 24 (5th Cir. 1961), revg. 32 T.C. 853 (1959).

Felt could have met his burden by showing, for instance, that the debtors were insolvent, the notes could not be assigned, or the notes would have traded at a deep discount. See <u>id.</u> But he gave us nothing about these subissues; and so we find that the notes were cash equivalents. Our default rule is to rely on the face value of the notes, as it is the only measure of this value that we have. See <u>A. & A. Tool & Supply Co. v. Commissioner</u>, 182 F.2d 300, 303 (10th Cir. 1950), revg. a Memorandum Opinion of this Court. We therefore find that the Felts must recognize as income in the year of the sale the entire face value--$1,489,260-- of the Specialty Finance notes.

The total gain or loss from the sale is the amount Felt received less his basis. He received cash and notes worth $1,989,260, and his basis was $1,725,852. This leaves a taxable gain of $263,408.

B. <u>Did the Sale Produce Capital Gain or Ordinary Income?</u>

Felt argues that since he "was a dealer in notes in his ordinary course of business * * * he is entitled to an ordinary loss for the total amount of the consideration represented by these notes." We have already found that Felt recognized gain on the sale, but this argument forces us to determine whether the gain was a capital gain or ordinary income. Property held by a taxpayer is generally a capital asset. When a capital asset is

sold, the gain or loss is capital too. Sec. 1222. Felt spent considerable time arguing whether the notes he received in the sale were capital assets, when he should have been arguing about the Reliance stock that he sold. Stock is a capital asset unless it falls within the section 1221(a)(1) exception for dealers who keep stock as inventory. Felt was a banker who admittedly dealt in "notes and mortgages," not stock. We therefore find that the stock was a capital asset; the gains from its sale are capital, too. See <u>Kadillak v. Commissioner</u>, 127 T.C. 184, 199 (2006) affd. 534 F.3d 1197 (9th Cir. 2008).

    C.  <u>When Is the Sale Taxable?</u>

Felt also argues that he did not recognize capital gains in 1986 because the sale was later rescinded by court order. But, as with his argument about part of the cash he received in consideration--cash he later might have to pay back--this argument founders on the claim-of-right doctrine. The Felts have to recognize income in the year they received it, and that year was 1986, because the Commissioner says so and the Felts never rebut it. They may have been entitled to a deduction later in the year of the rescission--if they in fact could prove they paid back the consideration that they had received--but that year is not before us.

## II.  <u>Cancellation-of-Indebtedness Income</u>

The next issue is the timing of $2 million in cancellation-of-indebtedness income. The Commissioner asserts that Felt

borrowed over $2 million from AGI, and there is no dispute that he never repaid it.  These unrepaid loans became income to Felt in 1989, when AGI's business registration lapsed.  Felt's counterargument is that he didn't owe AGI any money and that, if he did, AGI owed him more, so the amounts should offset.  He also argues that he didn't recognize the income in 1989 because AGI continued operating despite its lapsed registration, and that he didn't have to recognize cancellation-of-indebtedness income in 1989 because he was insolvent that year.  See sec. 108(a)(1)(B).  We therefore analyze:

> !    Whether Felt owed AGI money,
>
> !    whether his debt was offset by a debt AGI owed him,
>
> !    if he did have cancellation-of-indebtedness income, whether he realized it in 1989 or some other year, and
>
> !    whether he was insolvent at the time he realized the income.

A.   <u>Did Felt Owe a Debt to AGI?</u>

We face a paucity of evidence about Felt's debt to AGI.  The only records we have are the FHLBB examiner's handwritten notes and accompanying AGI ledgers, coupled with the Felts' stipulation that AGI records showed these loans and the loans were never repaid.  The records (which are, in places, illegible) show the following eight loans worth more than $2 million total, falling due between 1983 and 1987:

| Loan No. | Amount | Maturity Date |
|----------|--------|---------------|
| 31-020259-8 | $1,946,672 | 1-2-87 |
| 31-020031-1 | 16,937 | 11-1-86 |
| 32-020134-3 | 14,200 | 11-15-86 |
| 42-020223-4 | 16,500 | ?-12-86 [month illegible] |
| 32-020147-5 | 40,870 | 11-16-83 |
| 33-020058-4 | 16,000 | 3-10-84 |
| 38-020086-5 | 39,794 | 7-8-83 |
| 38-020087-3 | 58,000 | 11-01-83 |

Felt carefully claims that "the record is devoid of any AGI documentation reflecting" the $2 million loans. But he doesn't actually deny owing AGI money; his briefs dispute only whether the AGI records showed a debt, and whether they establish its amount. We agree that the evidence is thin, but the Felts stipulated that the AGI records "indicated that Mr. Felt was indebted to AGI in the amount of $2,148,973. This debt has never been repaid." Under Rule 91(e), stipulations are binding unless "justice requires" the Court to release a party from its stipulation. The Felts nowhere claim that we should release them from the stipulation; and since they were represented by counsel, we would be unlikely to grant such a request. We therefore find that Felt owed AGI $2,148,973 and never paid it.

B. Was Felt's Debt to AGI Offset by the AGI Notes?

We next examine whether the notes Felt acquired in the Reliance sale somehow reduce the debt he owed AGI and never

repaid.  Felt's problem here is a failure to present proof that he took steps to carry out a setoff.  Felt's setoff argument seems to be that if he has to realize cancellation-of-indebtedness income, he need do so only after netting what he owed AGI against what AGI owed him after he received AGI notes as part of the Reliance stock sale.  Without a setoff, it is the full amount of Felt's indebtedness to AGI that might create cancellation-of-indebtedness income.

Setoff is a state-created right.  <u>Citizens Bank of Md. v. Strumpf</u>, 516 U.S. 16, 18-19 (1995); <u>Dzikowski v. N. Trust Bank of Fla., N.A.</u> (<u>In re Prudential of Fla. Leasing, Inc.</u>), 478 F.3d 1291, 1297 (11th Cir. 2007).  Texas requires four steps to set off a debt:

- **!**    An intent to exercise his right to setoff;

- **!**    an action to accomplish the setoff;

- **!**    making a record of the setoff; and

- **!**    applying the funds taken by setoff to the debt owed.

<u>Tex. Commerce Bank-Hurst, N.A. v. United States</u>, 703 F. Supp. 592, 594-95 (N.D. Tex. 1988), affd. sub nom. <u>Tex. Commerce Bank-Ft. Worth, N.A. v. United States</u>, 896 F.2d 152 (5th Cir. 1990); <u>Shearson Lehman Bros., Inc. v. Resolution Trust Corporation</u>, No. 05-93-00527-CV (Tex. App., Feb. 23, 1994).  Felt did none of these things--at least while AGI was still in existence--and his mere

declaration of an intent to set off retrospectively is not enough. See In re Archer, 34 Bankr. 28, 30 (Bankr. N.D. Tex. 1983).

We therefore find that Felt did not exercise any right to setoff that he might have had, and that it is the full amount of his loans from AGI that generates cancellation-of-indebtedness income.

C.    When Was There an Identifiable Event Leading to Realization of the Income?

Since we have decided that Felt owed AGI money that was not diminished by setoff, we next turn to deciding the year in which his debt to AGI was canceled.  The Commissioner, relying on Cozzi v. Commissioner, 88 T.C. 435 (1987), argues that there was an "identifiable event" in 1989 because that was the year AGI forfeited its corporate charter and, he says, ceased doing business.  Felt says that AGI continued doing business after 1989 and any cancellation-of-indebtedness income would have arisen at the time of the bankruptcy proceedings in 1992, which is not a year at issue.

We have long recognized the problem of fixing when indebtedness is canceled; indeed, "it will often be impossible to find one, and only one, event that clearly establishes the time of abandonment [of a claim]; there is likely to be a range of times, any one of which would be reasonable." Id. at 447.  Our response to this uncertainty is to make taxpayers show that the Commissioner's stated date does not fall within the range of

reasonable dates.  Id. at 448; see Rule 142(a).  We look to the "facts and circumstances relating to the likelihood of payment" to determine what range of dates would be reasonable.  Id. at 445.

Cozzi tells us that a "scheduled final payment" passing with no payment on a loan is an "identifiable event" sufficient to trigger recognition of cancellation-of-indebtedness income.  Id. at 447.  Therefore, it would be reasonable to find that the Felts had $2 million of cancellation-of-indebtedness income as early as January 1987, because all of the loans were due by then.  See table supra p. 18.

Felt wants us to find that he incurred this income in 1992, the year he declared bankruptcy.  This would be five years after the last final payment date had passed with no payments (and nine years after the earliest maturity date had passed).  Felt's failure to include these AGI debts on his bankruptcy schedules also strongly indicates that he was no longer liable for these amounts.  His suggested date falls outside the reasonable range; he must have realized this income before 1992.[4]

But has Felt proven to us that the Commissioner's 1989 date falls outside of the reasonable range, too?  The Commissioner pinpoints 1989 because he believes that is the year AGI ceased doing business.  Felt did state during formal discovery that AGI

---

[4] We therefore find it unnecessary to decide the parties' arguments about whether an unlisted debt is discharged in bankruptcy; this debt was forgiven before Felt's bankruptcy.

ceased operating sometime before 1992, but argues that AGI didn't peter out until sometime after 1989. And he credibly testified that AGI continued to operate after its registration lapsed, and even reported on his 1992 bankruptcy schedules that he had been involved in running the business within the last two years.

Felt also directed us to section 7.12 of the Texas Business Corporation Act, which provides a three-year time limit for winding up the affairs of a dissolved business, to show that AGI could still have collected on a past-due debt after 1989. Tex. Bus. Corp. Act Ann. art. 7.12(A) (Vernon 2003). This is useful, because we apply substantive state corporate law as of November 20, 1989, the date that AGI lost its right to do business in Texas by failing to pay franchise taxes. Forfeitures for failure to pay franchise tax are governed by the Texas Tax Code, section 171.251, which reads (now and in 1989): "The comptroller shall forfeit the corporate privileges of a corporation on which the franchise tax is imposed if" and lists several triggering events, including failure to file annual reports and failure to pay franchise taxes. Tex. Tax Code Ann. sec. 171.251 (Vernon 2008); 1989 Tex. Sess. Law Serv. 584 (West) (effective Sept. 1, 1989). The effect of forfeiture is that the "corporation shall be denied the right to sue or defend in a court of this state." Tex. Tax Code Ann. sec. 171.252(1) (Vernon 2008). This raises a close question of Texas law: Should the three-year winding-down period from the Texas Business Corporation Act modify the forfeiture provision from the

Texas Tax Code?  If so, AGI did not relinquish the right to collect from Felt when it failed to pay franchise tax, and thus no identifiable event occurred in 1989.

There is an answer.  As of August 1989, article 7.12 of the Texas Business Corporation Act covered only "a corporation dissolved (1) by the issuance of a certificate of dissolution or other action by the Secretary of State, (2) by a decree of a court * * * , or (3) by expiration of its period of duration."  1989 Tex. Sess. Law Serv. 801 (West) (effective Aug. 28, 1989).  It did not include in its definition of a dissolved corporation a corporation which lost its corporate privileges for failure to pay franchise tax.  See id.; see also In re ABZ Ins. Servs., Inc., 245 Bankr. 255, 260 (Bankr. N.D. Tex. 2000) (explaining that 1993 amendment brought failure to pay franchise tax within purview of Texas Business Corporation Act article 7.12; before that, three-year period not applicable to franchise tax forfeitures).  Thus, we agree with the Commissioner that in 1989, AGI lost its ability to sue Felt for repayment in 1989, even though AGI could and did continue to transact business.[5]

However, simply because AGI lost its ability to sue Felt in 1989 does not make 1989 the magic year in which he realized cancellation-of-indebtedness income.  November 1989 (the date of

---

[5] AGI could have gotten this right back by paying its franchise tax.  Because we find that the identifiable event is not later than AGI's forfeiture, we need not analyze when AGI finally lost all rights to conduct business or dissolved.

AGI's forfeiture) fell more than two and a half years after the last maturity date for these loans and one year after the FHLBB sued Felt for more than $4 million--at which point any reasonable creditor probably would have stepped up collection efforts or considered the debt lost.  We are convinced that, although AGI lost its ability to pursue legal remedies in 1989, this year is too late to fall within the reasonable range.

We find that the Felts realized cancellation-of-indebtedness income in 1987, the year in which the last final maturity date came and went without payment.  Cozzi, 88 T.C. at 447.  We therefore find that the Felts realized $2 million in cancellation-of-indebtedness income in 1987, another of the years for which we have jurisdiction.

D.  Did The Felts Present Sufficient Evidence of Insolvency?

Our final question is whether, under section 108, the cancellation of the AGI debts should be excluded from income because the Felts were insolvent at the time.  If they can find refuge in section 108, it must be under section 108(a)(1)(B)--the Felts' bankruptcy ended up under Chapter 7, not 11, they are not farmers, and they make no argument that this is qualified real-property indebtedness.  That exclusion is limited to the amount of the insolvency, sec. 108(a)(3), and "insolvency" means that the taxpayer has an "excess of liabilities over the fair market value of assets", sec. 108(d)(3).  The relevant period is immediately

before the Felts realized their cancellation-of-indebtedness income, sometime in late 1986 or early 1987.

The Felts make only vague arguments as to their solvency. We know that in the late 1980s, they owned a home, although they estimated its value only as of the time of the bankruptcy.[6] Sharon testified that they owned two cars, but neither Felt presented evidence of their equity in those cars. Felt testified that he carried a life-insurance policy worth $250,000, but presented no evidence of whether he could cash it in. Felt testified that he still had the proceeds from his sale of Reliance in 1987, as the rescission suit did not start until 1988. Although they did not file a 1987 tax return, their 1985 and 1988 tax returns show positive income. And they stipulated to income in 1987:

| Income Source | Amount |
|---|---|
| Reliance Savings compensation | $37,500 |
| Interest | 4,634 |
| Self-employment income | 53,042 |
| Capital gains from stock | 9,246 |
| Total | 104,422 |

The Felts gave us no evidence of savings, investments, or income from other business ventures in 1987, and fail to convince us they

---

[6] Felt's bankruptcy schedules in 1992 showed an outstanding balance of $1.2 million on the house, for which the Felts took mortgage deductions of $80,000-$100,000 in the years in which they did file tax returns. Yet the Felts provided no evidence of their equity in the house for any of the years at issue, much less 1987.

have accounted for all of their income and assets for that year.
For instance, they earned $4,634 in interest in 1987 but never
stated the source of that interest. (We infer there was an asset
with some positive fair market value generating that interest.)

Without this evidence, we cannot find that Felt's liabilities
exceeded the fair market value of his assets. We therefore find
that the Felts have not met their burden of proving the existence
and extent of their insolvency in 1987 (or any year before their
1992 bankruptcy), and so we find they were not insolvent as to any
of the AGI debt. We therefore hold that the Felts must recognize
the entire amount as cancellation-of-indebtedness income in 1987.[7]

III. Income From Birdie Felt

Although not the largest dollar amount here, the question of
whether the Felts should recognize income from Birdie Felt is
perhaps the most complicated issue. The Felts tell us they were
struggling financially after the bankruptcy, and that Birdie
helped by paying their family expenses out of her accumulated
riches. The Commissioner argues that this is implausible--Birdie
Felt was a woman in her 80s with no discernible history of gainful

---

[7] Felt owed AGI $2,148,973. The Commissioner asserted only
$2 million in cancellation-of-indebtedness income in the notice
of deficiency, and he never moved to amend his pleadings to
assert any increase in deficiency this might cause. There are so
many other adjustments from our findings and the parties' various
concessions and compromises that we can't predict whether this
will have the effect of limiting the amount in our final
decision. We direct the parties to be aware of this possible
problem in trying to reach agreement under Rule 155.

employment or independent income[8] who may have been suffering from Alzheimer's. The Commissioner also points out that she somehow found hundreds of thousands of dollars to deposit into her bank account during these years, and unlike most retirees, had bank deposits that increased fourfold in six years, with wire transfers remaining relatively stable:

| Year | Wire Transfer Deposits | Total Deposits |
|------|------------------------|----------------|
| 1994 | $45,000 | $59,565.74 |
| 1995 | 60,000 | 124,706.09 |
| 1996 | [9]90,000 | 236,854.74 |
| 1997 | 90,000 | 138,100.95 |
| 1998 | 102,500 | 158,173.93 |
| 1999 | 107,502 | 223,130.00 |

Despite her allegedly close and generous relationship with her son and daughter-in-law, both professed utter ignorance of the source of her riches or the nature of her offshore wire transfers. And her generosity was total--she died with no money in her estate but thousands of dollars of personal credit-card debt.

---

[8] Indeed, IRS records presented at trial show that Birdie owed no taxes for 1994, 1995, 1996, 1997, or 1998. She owed $836 for 1988, $1,222 for 1989, and $450 for 1990. Like her son, Birdie only occasionally filed tax returns. Unlike her son, she may have earned so little that she didn't have to.

[9] There was actually $122,207 in wire transfers in 1996. However, one for $32,207 is from First American Title in Houston, not the offshore transferors responsible for the other transfers, and we have excluded it from this calculation.

This all smells not quite right. The Commissioner determined that the money flowing from overseas through Birdie's accounts to the Felts was the Felts' own income. In general, the taxpayer bears the burden of disproving the Commissioner's determination. Rule 142(a). The Felts argue, however, that the Fifth Circuit, to which appeal from this case would lie, has held that "a court need not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present some predicate evidence supporting its determination." Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68; see also Siebert v. Commissioner, T.C. Memo. 1997-6. So before we can find that the money Birdie repeatedly dropped on her son was his own income, we look at whether the Commissioner's determination on this subject was arbitrary and erroneous, or whether the Commissioner had "some factual foundation for * * * [his] assessment." Portillo, 932 F.2d at 1133.

In Portillo, the taxpayer did not receive a Form 1099 in time to file his tax return, so he just estimated his income. Id. at 1130-31. After he filed his return, he finally got a Form 1099 from his employer showing much more income than he had reported. Id. at 1131. But the Commissioner, rather than investigate whether Portillo received the extra income, relied on the employer's Form 1099 and issued a notice of deficiency. He then

relied on the presumption of correctness when Portillo objected.

Id.  The Fifth Circuit held that the Commissioner did not get the

benefit of the presumption until he "engage[d] in one final foray

for truth in order to provide the court with some indicia that the

taxpayer received unreported income;" one way to accomplish this,

the court said, was by analyzing the taxpayer's bank deposits.

Id. at 1133-34.  In another Fifth Circuit case, that court found

that the Commissioner could not assess wagering excise taxes

without some evidence linking the taxpayer to gambling activities

within the period of assessment.  Carson v. United States, 560

F.2d 693, 696 (5th Cir. 1977).

But the Felts overlook a key difference in their case:  In

both Portillo and Carson, the taxpayer filed a return.  The rule

is different for taxpayers who don't file; in Parker v.

Commissioner, 117 F.3d 785, 787 (5th Cir. 1997), the court held

that the Commissioner had no duty to conduct an independent

investigation of third-party payment reports when the taxpayers

failed to file their own sworn statement (such as a Form 1040)

disavowing the income.

We find that the Commissioner took sufficient steps to

investigate whether the Felts received money from Birdie.  Unlike

what he did in Portillo, the Commissioner here secured extensive

bank records showing checks Birdie wrote to David or for the

Felts' expenses, as well as records from Sharon Felt's bank

account showing she cashed checks from Birdie; there is no question that David and Sharon actually received this money. The Felts provided no tax return or statement, sworn or otherwise, saying they did not. In fact, they confirmed that she gave them money to pay their bills.

Although the Commissioner cannot point to any single source of Felt's income flowing to Birdie, the Commissioner has supplied a few pieces of evidence. The Commissioner showed that the following entities, all related to David Felt, deposited money into Birdie's bank account from 1995-2000:

| Entity | Year | Amount |
| --- | --- | --- |
| Tower | 1995 | $4,077.61 |
| | 1996 | 4,000.00 |
| | 1997 | 16,500.00 |
| | 1998 | 2,750.00 |
| | 1999 | 9,500.00 |
| | 2000 | 2,000.00 |
| Gibraltar | 1995 | 550.00 |
| | 1996 | 6,893.00 |
| J&N | 1995 | 1,000.00 |
| | 1998 | 1,350.00 |
| AGI-Nev | 1998 | 55,000.00 |
| Estate of Vansickle | 1995 | 4,000.00 |
| Total | | 107,620.61 |

We are therefore convinced that at least some of Birdie's deposits are attributable to David Felt's business activities, even without knowing their exact source. We find that the notice

of deficiency was not arbitrary and erroneous, and hold the burden of disproving the Commissioner's determination is on the Felts.

The Felts have several counterarguments. The first is that the IRS somehow relied on insufficient IRS records of Birdie's tax information. The second is that the money from Birdie was not their income, but only gifts from a loving mother. Finally, the Felts argue that some of the money flowing into Birdie's accounts and then back out to the Felts was (or will be) taxed as income from J&N, Tower, or other Felt entities.

While the Felts try to fault the IRS for failing to enter into evidence certain types of account transcripts, they point to no specific irregularities or missing information in the IRS records that we do have. It's the Felts' burden to show that these records are flawed, but they gave us no evidence and apparently made no efforts to acquire any through discovery. We therefore find that the IRS records of Birdie's taxes that we have are reliable.

On the question of whether Birdie's transfers were gifts, we focus on her intent. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). And when the Commissioner asserts that a transfer is taxable income, the taxpayer has the burden of showing that it was in fact a gift; this means that the taxpayer has to introduce credible evidence of the donor's "detached and disinterested generosity." Id. Transactions between family members that reduce

taxes necessarily cause us to question whether the transaction was a <u>bona</u> <u>fide</u> gift or just an effort to avoid taxes. <u>Carriage Square, Inc. v. Commissioner</u>, 69 T.C. 119, 133 (1977).

Birdie Felt died years before trial, so we lack her testimony. David Felt testified that Birdie gave the Felts money "because we needed it" and that he never considered it income. He also testified that none of the money flowing into Birdie's accounts was his money, but later said that he sometimes deposited money into her accounts from his businesses because he "probably" was paying back loans she had made. Sharon testified that Felt asked Birdie for help paying bills but had no intention of paying her back.

We do not find the Felts credible when they deny that the money from Birdie was really their own. David and Sharon's tax rate would have been much higher than Birdie's (as she earned no discernible income in most of the years at issue), and David Felt had reason to fear creditors' discovering that he still had significant sums of money, given the unpaid and undischarged $4.2 million judgment from the Reliance sale. The bank records in evidence show that Felt's businesses shed money in 1996, at the very time Birdie's wealth began to rise. Her payments to the Felt family peaked during 1996 and 1997--and 1997 was the year the Office of Thrift Supervision won its judgment against David Felt. The checks from Felt's businesses deposited into Birdie's account

lead us to find Felt not credible when he testified that he did not deposit money into her accounts.  Together with the Felts' failure to provide any other evidence of Birdie's intent, this also reduces his overall credibility as a witness.  We thus find that the money from Birdie was not a gift, but the Felts' own income circuitously routed.

That leaves us to decide whether money deposited into Birdie's account was actually income on which the Felts already owe tax or perhaps savings on which they already paid tax.  This requires a careful parsing of the sources of those deposits.  The Felts provided no evidence, credible or not, regarding the sources of Birdie's wealth.  They chose not to call as witnesses two men who wrote monthly checks to Birdie, or David Felt's own family members who might have had better knowledge of his mother's sources of income.  Although the Felts faulted the IRS for not seeking additional information about the offshore wire transfers, the Felts also chose not to seek this additional information[10] or provide bank records for any of their other business entities.  We infer that such information would have proven detrimental to their case.

---

[10] Instead, the Felts claim they "did not have the authority" to request this information.  They did have the authority, however, to obtain records from Capital Trading Partners (the organization responsible for wiring Birdie's money) and introduce such evidence.

In the end, the only relief we can provide for the Felts is to make sure that money flowing from David to Birdie to David is not taxed twice.  Since the Felts failed to file tax returns for most years, we must make sure only that we are not double-counting income already attributed to the Felts in this opinion.  Since, for reasons we list below, money from J&N is income to the Felts, that is somewhat easy to trace.  We will also subtract AGI-Nev money flowing into Birdie's account from the Felts' income (as we explain infra section V).  The parties have stipulated amounts of income from the Tower account in 1996-98 as well:

| Year | Entity | Amount | Total |
|------|--------|--------|-------|
| 1996 | Tower | $4,000 | $4,000 |
| 1997 | Tower | 16,500 | 16,500 |
| 1998 | Tower<br>J&N | 2,750<br>1,350 | 4,100 |

The Commissioner wants us to find the following amounts of income to the Felts from Birdie:

| 1996 | 1997 | 1998 |
|------|------|------|
| $78,262.23 | $67,063.38 | $112,248.70 |

We subtract from the amounts in the notice of deficiency those moneys coming from Felt-owned entities.  This leaves us with the following amounts of other income from Birdie Felt:

| 1996 | 1997 | 1998 |
|------|------|------|
| $74,262.23 | $50,563.38 | $108,148.70 |

IV.  J&N Income

The Commissioner used a bank-deposits analysis to reconstruct the Felts' income for several years.  Although David Felt apparently kept no bank account in his name, the Commissioner argues that he drew checks for personal expenses from bank accounts held in the names of his business entities, and therefore the money flowing into these bank accounts is his income.  Although the parties have resolved some of these disputes, the Felts and the Commissioner remain far apart on how much of the money flowing into J&N's bank account was income in 1997.  The Commissioner wants to tax all of the $153,118.04 deposited into this account; the Felts say that J&N's only cash intake was $80,000 from a business deal, and they concede that, after deducting expenses, $73,118 of that was income to them.  They argue that the Commissioner's income reconstruction "failed to take into account any expenses or deductions that * * * [the Felts] may have been entitled to," but then provide no evidence substantiating any business deductions.  This argument fails for want of proof.

We think it's plausible that other business accounts held money that found its way into the J&N account.  But we won't speculate--in the absence of evidence, we'll rely on the burden of

proof, which here lay with the Felts to disprove the Commissioner's determination, which therefore stands.

V.    AGI-Nev Income

Another point of contention between Felt and the Commissioner is whether the money deposited into the AGI-Nev accounts in 1998 is income.  The Commissioner determined that it was, because forms from the Southern National Bank of Texas showed two accounts were opened with $250,000 and $50,000 deposits, respectively.  The Felts stipulated that these documents were true and correct, so we find that Felt and his mother deposited $300,000 into those two bank accounts in 1998.

The Felts' only argument is that this was not their income because it was money owed to AGI when AGI ceased to do business, and thus should have been income to AGI.  Well, no.  First, AGI forfeited its right to do business in 1989, and Felt never in the intervening nine years sought to remove this impediment by paying the required tax and penalties.  Second, AGI was a Texas corporation, but Felt chose to deposit the $300,000 in an account of a corporation with a similar name but incorporated in Nevada.  Corporations don't succeed to one another's assets because of similar names.  And, somewhat oddly, both Felt and his mother were signatories on the AGI-Nev accounts, though only Felt had been a shareholder and director of the old AGI.  For all of these

reasons, we find the Felts' arguments on this point wholly unpersuasive.

We do find Felt's testimony that he and his mother used the $300,000 for personal expenses to be credible. This, though, just leads to another question: How should that money be allocated between Felt and Birdie?

Felt claims that they split it equally.

We don't believe him--it might even be reasonable to conclude that it was all his income and he just chose to give some to his mother. But in the absence of very much evidence on this issue, we will look for the amount Birdie actually got from the AGI-Nev deposits as, by an ever-so-slight preponderance of the evidence, the correct measure of what she took from AGI's old creditors. We look to the checks submitted as evidence. There are several from one of the AGI-Nev accounts. One check, written in February 1999, is for $17,048.39 and was endorsed by David Felt. The others, from 1998, total $55,000 and were endorsed for deposit into Birdie's Wells Fargo account. Because Felt presented no contrary evidence, other than his testimony that he and his mom intended to split it equally, we find that Birdie got only this $55,000 of the total $300,000 deposited into the AGI-Nev accounts. We find that the remaining $245,000 is Felt's income in 1998.

## VI.  Section 66 Innocent Spouse Relief

Texas is a community-property state, and under section 66, married couples who do not file joint tax returns "generally must report half of the total community income earned by the spouses during the taxable year" unless an exception applies.  Sec. 1.66-1(a), Income Tax Regs.  Sharon Felt asks us to find that she falls within the section 66(c) exception, and thus that she is liable only for the income attributable to her.

Her request falls within section 66(c), which offers two types of relief--"traditional" and "equitable."  Sharon requested "traditional" relief, which helps a spouse who:

> !    Did not file a joint return for the taxable year, and

> !    omitted from gross income an item of community income that should have been included but that would have been allocated to the other spouse, and

> !    proves that he or she did not know or have reason to know of the omitted item, if it would also,

> !    given the facts and circumstances, be inequitable to include that item in the requesting spouse's income.

The Commissioner does not dispute that Sharon Felt meets the first two requirements, but he argues that she knew of the omitted items and that, given the facts and circumstances, it would not be inequitable to include the items in her income.

We choose to start with section 66(c)(4), and ask whether, given all the facts and circumstances, it would be inequitable to include all the many items at issue in Sharon's gross income.  We

do this because the last requirement helps narrow the years for which we must test Sharon's knowledge of each and every item of omitted income. The regulation, section 1.66-4(a)(3), Income Tax Regs., tell us that one relevant factor--indeed, the only factor that the parties discuss at any length[11]--is whether the requesting spouse benefited from the omitted items of income. The regulations are even more helpful, as they go on to clarify that a "benefit includes normal support, but does not include de minimis amounts." Sec. 1.66-4(a)(3), Income Tax Regs. The Felts argued that Sharon's lifestyle was not lavish during this time, but that is the test for innocent-spouse relief under section 6015 and section 66(c) equitable relief, not the test under section 66(c)(4).[12]

---

[11] The regulation, of course, does provide that lack of significant benefit is only one factor to be considered in what is supposed to be an all-the-facts-and-circumstances test. The only other specific factors that it mentions are "desertion, divorce or separation," sec. 1.66-4(a)(3), Income Tax Regs., none of which is present here. The regulation also incorporates by reference revenue procedure 2000-15 and its own open-ended list of factors. We don't make specific findings on these factors because the Felts didn't argue them.

[12] See sec. 1.6015-2(d), Income Tax Regs. ("One relevant factor * * * is whether the requesting spouse significantly benefitted * * * A significant benefit is any benefit in excess of normal support."). The Commissioner also applies a significant-benefit test to requests made under section 6015(f) and the equitable-relief provision of section 66(c). Rev. Proc. 2003-61, 2003-2 C.B. 296, 299, sec. 4.03(2)(a)(v) (applying the section 6015(b) standard).

The Felts never argue that Sharon's standard of living fell below "normal support," or that the items of income Felt earned were diverted to anything but family expenses (i.e., "normal support"). Sharon credibly testified that her lifestyle didn't change much until 1992, when their mortgage was foreclosed and they no longer could afford domestic staff; this is a strong indication that she is not entitled to section 66(c) traditional relief for any of the omitted items of income before 1992. After 1992, we still find for the most part that she enjoyed "normal support," even taking into account the Felts' relatively high standard of living, and we have no evidence Felt diverted his income from the family. Sharon testified that whenever she needed money to pay bills, she would ask David and he would write her a check. Although they no longer owned a home, they did rent very nice houses. Sharon continued to have a car and a bank account with substantial balances in most years.

The Felts stipulated some items of income, and this opinion upholds the Commissioner's determination of other items, in the following amounts for 1994-98:

| Year | Source | Amount |
|------|--------|--------|
| 1994 | NationsBank | $5,311.00 |
|      | Tower | 5,455.00 |
| Total |      | 10,766.00 |
| 1995 | NationsBank | 14,048.00 |
|      | Tower | 19,995.00 |
| Total |      | 34,043.00 |
| 1996 | NationsBank | 9,623.00 |
|      | Tower | 13,989.00 |
|      | Self-employment | 6,405.00 |
|      | Self-employment income adjustment | 21,842.00 |
|      | Birdie Felt | 74,262.23 |
| Total |      | 126,121.23 |
| 1997 | NationsBank | 3,516.00 |
|      | Tower | 42,981.00 |
|      | J&N | 143,636.04 |
|      | Birdie Felt | 50,563.38 |
| Total |      | 240,696.42 |
| 1998 | NationsBank | 1,131.00 |
|      | Tower | 35,074.00 |
|      | J&N | 27,775.00 |
|      | Birdie Felt | 108,148.70 |
|      | AGI-Nev | 245,000.00 |
| Total |      | 417,128.70 |

There is evidence that the Felts had a lower income in 1994 and 1995. There are bank records for those years showing that Felt diverted income between his businesses and his mother, suggesting that Sharon may not have gotten the benefit of some income items. For those years, we are willing to assume that Sharon did not receive "normal support" from the income.

That leaves us to decide whether she meets the last prong of the traditional relief test, section 66(c)(3), whether she knew or had reason to know of each item of omitted income in 1994 and

1995.  This requires an item-by-item analysis.  If Sharon was aware of the source of the income, but not aware of the amount, she is considered to have knowledge of the item.  See sec. 1.66-4(a)(2)(ii), Income Tax Regs.  The regulations also say to look at "all of the facts and circumstances" to determine whether a reasonable person would know of the income.  Sec. 1.66-4(a)(2)(i), Income Tax Regs.  The relevant facts and circumstances can include the nature of the item, amount of the item relative to other income items, the couple's financial situation, Sharon's educational or business experience, and whether the item was listed on prior years' returns.  Id.

Almost half of the conceded income for each year was in Sharon's bank account, over which she had sole signatory power. We find that she had actual knowledge of that money.  The rest of the money came from the Tower bank account.  She testified that she had heard the name Tower but didn't know what Tower did. However, Sharon deposited checks from Tower into her own bank account in 1994 and 1995, leading us to find that she knew David had a business called Tower that generated family income.  Knowledge of the source of income is sufficient to find knowledge of the items of income themselves.  We find that Sharon knew of the items giving rise to the deficiencies, and that she fails the test for traditional relief under section 66.

We can't stop yet, however, because Sharon also asks for
equitable relief under the flush language of 66(c).[13]  The last
sentence of the flush language of section 66(c) reads:

> Under procedures prescribed by the Secretary, if, taking into
> account all the facts and circumstances, it is inequitable to
> hold the individual liable for any unpaid tax or any
> deficiency (or any portion of either) attributable to any
> item for which relief is not available under the preceding
> sentence, the Secretary may relieve such individual of such
> liability.

Unlike the traditional test, which asks whether it would be
inequitable to include a specific item in one spouse's past

---

[13] Although the Commissioner didn't raise the issue, there
is a real question about the timeliness of Sharon's section 66(c)
request.  That section refers us to the regulations.  Section
1.66-4(j)(2)(i), Income Tax Regs., imposes no deadline for
requesting equitable relief.  Sec. 1.66-4(j)(2)(ii), Income Tax
Regs.  But they do point us to Revenue Procedure 2000-15,
superseded by Revenue Procedure 2003-61.  Sec. 1.66-4(a)(3), (b),
Income Tax Regs.  (Both paragraphs read: "Factors relevant to
whether it would be inequitable to hold a requesting spouse
liable, more specifically described under * * * Revenue Procedure
2000-15 * * * are to be considered in making a determination
under this paragraph.")  The Revenue Procedure states as a
"threshold condition" for *equitable* relief under section 66(c)--
that the requesting spouse "applies for relief no later than two
years after the date of the Service's first collection activity,"
and refers us to section 1.6015-5(b)(2)(i), Income Tax Regs., for
the definition of collection activity.  Among the actions
qualifying as "collection activity" is "the filing of a claim by
the United States in a court proceeding in which the requesting
spouse is a party or which involves property of the requesting
spouse."  Sec. 1.6015-5(b)(2)(i), Income Tax Regs.  The April
1992 order approving Sharon's bankruptcy disclosure statement
lists the IRS as a priority tax claimant, and lists $28,846.25 of
priority tax claims.  Of this, $27,000 represented a federal tax
lien.  While this doesn't prove that the United States actually
filed a claim for any of the years before us, it suggests that
Sharon might have missed one of the threshold requirements of the
revenue procedure for equitable relief.  See also Lantz v.
Commissioner, 132 T.C. __ (2009).

income, the equitable relief provision looks to the present--would it be inequitable to make that spouse pay the liability today?[14] We have in the past found that we have jurisdiction to hear section 66(c) equitable claims in deficiency cases, although we lack jurisdiction over stand-alone claims. Bernal v. Commissioner, 120 T.C. 102, 107-08 (2003). In deficiency cases, we review these as affirmative defenses.

First, the procedural issues. Affirmative defenses must be raised in the pleadings. Rule 39. Although Sharon should have raised the innocent-spouse defense in her petition, or amended the petition after it became clear she would raise the issue at trial, she may still be saved if the Commissioner expressly or impliedly consented to trying the matter. See Rule 41(b). Although counsel for the Commissioner did inform the Court that he was displeased at receiving such late notice of the issue, he failed to object at trial and never raised his concerns on brief, despite extensive and thorough coverage of the section 66(c) issue. We find that he impliedly consented to try the matter.

The Commissioner on brief argues only that Sharon is not entitled to section 66(c) equitable relief because she failed to file a Form 8857, which he claims is "the most fundamental of all

---

[14] Despite the past-present distinction, both sections of the regulations guiding our determination of what is "inequitable" inexplicably direct us to the same revenue procedure.

the threshold requirements."  Although he cites Revenue Procedure 2003-61, section 4.01 for this proposition, that requirement is actually in section 5 and allows a taxpayer to make the request by Form 8857 or "other similar statement signed under penalties of perjury."  See also sec. 1.66-4(j), Income Tax Regs.

The only document in the record signed by Sharon Felt is the Tax Court petition, which never mentions innocent-spouse relief or anything like it.  By failing to provide the Commissioner notice of the section 66 argument, the Felts effectively prevented the Commissioner from making a pretrial determination as to whether Sharon was entitled to equitable relief; therefore, there is no determination to review.  We find that the Felts failed to provide proper notice of this claim, and therefore we will not consider the issue.[15]

Although this seems harsh for Sharon Felt, all hope may not be lost; it is at least possible that she might be able to raise section 66(c) equitable relief as a defense in any collection hearing under section 6330.  See sec. 6330(c)(4)(A).

---

[15] There is also a potential problem in deciding the appropriate standard of review.  In cases like Beck v. Commissioner, T.C. Memo. 2001-198, we held that we should review for abuse of discretion.  But we recently held in the closely related situation of requests for relief under section 6015(f) that we review de novo.  See Porter v. Commissioner, 132 T.C. __ (2009).  We will figure out Porter's effect on section 66(c) in some later case.

VII.  Additions to Tax

The final issues are all the additions to tax that the Commissioner asserts under sections 6651(a)(1) and 6654 for all the tax years at issue, and additions under section 6651(a)(2) for 1996-98.

Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return.  The Commissioner has met his burden of production because the Felts stipulated that they did not file tax returns for any of the years at issue.  The Felts argue only that Sharon should not have to pay these additions, thereby conceding them as to David.  Sharon seems to make two arguments.  The first relates only to 1987 and 1989, years for which the Felts got a letter from the Commissioner stating they did not need to file a tax return.  David Felt testified that he thought they got the letters around the time of the bankruptcy and that he didn't know why he had received them, because he hadn't asked for them.  We admitted the letters as evidence over the objections of the Commissioner's counsel, although we share his concerns about their origin.  The letters are dated 1993, several years after the Felts' returns would have been due for 1987 and 1989.  But in 1992 Sharon filed bankruptcy schedules stating:  "The Debtor and her husband have not filed Federal Individual Income Tax returns for the calendar years 1986 through 1991 because of losses incurred by the Debtor's husband," the same reason Felt cited for not filing

in the first place.  We therefore find that Sharon did not rely on the 1993 letters in failing to file.

Her second argument is stronger.  She argues that because she was unaware of the income from Felt's businesses, she lacked sufficient information to file income tax returns.  She relies on two cases from the early 1980s.  In <u>Crane v. Commissioner</u>, T.C. Memo. 1982-350, the husband actively hid his income from his wife; in <u>Fleming v. Commissioner</u>, T.C. Memo. 1984-130, the wife was afraid of her husband's violent temper and did not know tax returns had not been filed.  There is no evidence that Felt actively hid his income from Sharon.  She did testify credibly that when Felt would explain his business dealings to her, she would get bored and lose interest, but that doesn't amount to concealment.  And her bankruptcy filings state that Sharon and her counsel "have examined all transactions for the period commencing in 1990 until the date of filing of the Petition."  Those schedules state that she and her husband expected to earn $70,000 per year during the duration of the bankruptcy plan.  Again, this indicates that she had at least some access to financial information.  There is also no sign that Sharon was afraid to ask Felt about family or business income; she testified that she asked Felt about the Reliance sale, and she also testified that she would ask him about expenses in credit-card statements until "he got irritated and sent the bills to his office."  Sharon knew

about several of Felt's businesses and even had signatory powers over the J&N bank account. She has not convinced us that she lacked access to the information necessary to file a separate tax return, and so we will sustain all the failure-to-timely-file additions to tax.

The second addition, under section 6651(a)(2), is for failure to pay tax. Again, the Felts contest this only as it applies to Sharon. The Commissioner must do a little more to meet his burden here. He must show either that he filed a substitute for return (SFR) under section 6020(b) or that the Felts filed a return showing tax due. See sec. 6651(a)(2); Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), affd. 521 F.3d 1289 (10th Cir. 2008). The SFRs must meet certain requirements; a bare front page of a Form 1040 will not suffice. Id. at 209. The Commissioner provided us with SFRs for Sharon Felt for 1996, 1997, and 1998; these documents include not only the front page of a Form 1040 with Sharon's name, Social Security number, and filing status, but also certifications by the preparers, work papers showing amounts of tax due and penalties, and detailed explanations. We therefore hold that the Commissioner has met his burden of production, and sustain the additions to tax in the face of Sharon's claim that she had reasonable cause for her failure for the same reasons we relied on in sustaining the failure-to-timely-file additions.

The Commissioner also asserted an addition to tax under section 6654 against both David and Sharon Felt for their failure to pay estimated tax. The Felts make no claim of error regarding these assertions, and we therefore deem them conceded. Section 6654 additions are mandatory and mathematical, with no reasonable-cause exception. Crane v. Commissioner, T.C. Memo. 1982-350.

Decision will be entered

under Rule 155.