T.C. Memo. 2017-73

UNITED STATES TAX COURT

EDDIE BORNA AND VICTORIA BORNA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24641-11.                          Filed May 1, 2017.

P-H is a real estate entrepreneur.  During or before 1997, P-H
and at least two Chinese citizens who he believed were politically
influential formed a venture in China intending to prosper financially
from the Summer Olympics scheduled to be held in China in 2008.
P-H aimed to raise sufficient funds for the venture through a plan
under which he self-financed the purchase of third-party notes.  The
venture failed.  R determined, in part, that P-H failed to report as
income amounts that he received from the obligors of the third-party
notes.

Held:  Ps failed to report income to the extent stated herein.

Held, further, tax consequences determined as to four items that
the parties dispute as to income that respondent determined was
reportable on Schedule D, Capital Gains and Losses.

[*2]     Held, further, Ps may deduct sole proprietorship expenses for rents and leases, taxes and licenses, and commissions and fees to the extent stated herein.

Held, further, Ps are liable for the accuracy-related penalties to the extent stated herein.

Solis Cooperson, for petitioners.

Steven M. Roth and Sarah A. Herson, for respondent

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Petitioners petitioned the Court to redetermine respondent's determination of the following deficiencies in their Federal income tax for 2004, 2005, and 2006, an addition to tax under section 6651(a)(1), and accuracy-related penalties under section 6662(a):[1]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Accuracy-related penalty sec. 6662(a) |
|------|-----------|------------------------------|------------------------------------|
| 2004 | $267,397 | $15,243 | $53,479 |
| 2005 | 943,426 | -0- | 188,685 |
| 2006 | 340,121 | -0- | 68,024 |

[1]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code of 1986, as amended for the years in issue (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are rounded.

**[*3]** Respondent subsequently altered that determination, asserting in an amended answer that there are increased deficiencies, addition to tax, and accuracy-related penalties as follows:[2]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Accuracy-related penalty sec. 6662(a) |
|------|------------|--------------------------------|---------------------------------------|
| 2004 | $268,918 | $15,319 | $53,784 |
| 2005 | 1,060,127 | -0- | 212,025 |
| 2006 | 479,940 | -0- | 95,988 |

Respondent has since conceded that petitioners are not liable for the addition to tax.

Following concessions, we decide the remaining disputed issues for the years in issue:

1. whether petitioners failed to report income from petitioner husband Eddie Borna's sole proprietorship;

2. the tax consequences of four items that the parties dispute as to income that respondent determined were reportable on Schedule D, Capital Gains and Losses;

---

[2]Respondent's alteration of the determination stemmed from respondent's review during this proceeding of newly acquired information and documentation. The amended answer reflected further adjustments to sole-proprietorship unreported income and allowable expenses and to capital gains or losses.

**[*4]**   3.  whether petitioners may deduct sole proprietorship expenses for rents and leases, taxes and licenses, and commissions and fees in amounts greater than respondent allowed; and

4.  whether petitioners are liable for the accuracy-related penalties that respondent determined.

## FINDINGS OF FACT

### I.  Preliminaries

The parties submitted nine separate stipulations of facts and exhibits, together with three separate stipulations of settled issues.  We find the stipulated facts and the settled issues accordingly.  The stipulated facts and exhibits and the stipulations of settled issues are incorporated herein by this reference.[3]

Petitioners are husband and wife.  They filed joint Federal income tax returns for 2004 through 2006 (respectively, 2004 return, 2005 return, and 2006 return; collectively, subject returns).  They timely filed their petition commencing this action, and they resided in California at that time.

---

[3]In the event of any perceived conflict between the balance of this opinion and the parties' three stipulations of settled issues, the Court intends that the agreed-to settlements by both parties in the stipulations of settled issues shall control.  Where the three stipulations of settled issues indicate that an issue is not resolved and agreed to or is for trial, this opinion shall control.

[*5] II. Petitioners' Business Activities

A. Land Bank

Mr. Borna owned a real estate business, Land Bank of America (Land Bank). Land Bank was in California City, California, and it has been selling land since 1980.[4] Mr. Borna operated Land Bank as a sole proprietorship.

B. Superb Properties

Superb Properties was another business in California City. Superb Properties, although owned by others, operated under Mr. Borna's broker's license, primarily selling real estate through real estate agents. Mr. Borna normally received 10% of the real estate agent's commissions for the use of his real estate broker's license.

C. Note Purchasing Business

1. Background

During or before 1997, Mr. Borna with at least two Chinese citizens who he believed were politically influential formed a venture in China called Zhuo Zhou Borna Plaza Real Estate Development, Ltd. (Zhuo Zhou Development). Originally Mr. Borna conceived the idea for Zhuo Zhou Development and owned all of it.

---

[4]Petitioners also bought and sold real estate which they held in their own names. They reported some of these sales on the subject returns, more specifically, on Forms 6252, Installment Sales Income.

**[*6]** Early on to get going he partnered with an individual who he believed had been or was the Finance Minister of the People's Republic of China under Mao Zedong's government. This individual and/or his two daughters, who Mr. Borna believed were children of the Finance Minister and one (Helen Fongii) who Mr. Borna believed may have served in a governmental capacity, acquired a 5% interest in Zhuo Zhou Development shortly after its formation. Zhuo Zhou Development aimed to build a small town in China containing 15,000 condominiums, a very long strip mall, two or three schools, and a hospital plus 100,000 square meters of industrial and commercial buildings space.

Mr. Borna, from its inception, did not have sufficient funds to invest in Zhuo Zhou Development, and he consequently sought ways to raise funds for the venture. Mr. Borna eventually met Nigel Barrow, who aspired to join the venture. Both Mr. Barrow and Mr. Borna anticipated that Zhuo Zhou Development would be profitable given, inter alia, that Bank of China financing was anticipated and the Summer Olympics were scheduled to be held in China in 2008.

The politics surrounding Zhuo Zhou Development's operation in China and its location thousands of miles from California City made it difficult for Mr. Barrow to participate in the venture directly. Mr. Barrow structured a plan under which Mr. Borna would acquire from Mr. Barrow third-party notes that he owned

[*7] (Barrow notes).[5] Mr. Borna could then use proceeds from the notes to help fund Zhuo Zhou Development. Thereafter, Mr. Borna would pay to Mr. Barrow, without stated interest, the principal amounts of the Barrow notes two years after the due dates of the Barrow notes. These payments were generally scheduled to come due during 2015.

## 2. The Business

Starting in or around 2002 through at least 2006, Mr. Borna acquired approximately 100 Barrow notes from Mr. Barrow under a formal agreement that they memorialized in writing on or about December 30, 2003. Mr. Borna acquired the Barrow notes by contemporaneously creating financing notes (Borna notes), each with corresponding identical principal balance due, which Mr. Borna in turn executed and gave to Mr. Barrow. Mr. Borna promised in the Borna notes to pay the face amount of the Barrow notes to Mr. Barrow in 2015; however, unlike the Barrow notes, none of the Borna notes had stated interest. The Borna notes were payable to Mr. Barrow at various dates in 2015, and no payments were due before

---

[5]The record does not include copies of all of the Barrow notes, and it appears that in some cases Mr. Borna did not acquire an actual note but simply a debt (usually evidenced by a deed of trust) that was owed to Mr. Barrow arising from his sale of real estate to various third parties. For simplicity and convenience, we use the term "Barrow note" to include those debts for which a note is not in the record (or may never have actually been issued).

[*8] 2015. Each Borna note was secured by a stated percentage of Mr. Borna's interest in Zhuo Zhou Development.

Mr. Borna was entitled to keep all payments on the Barrow notes except to the extent that a payment was for principal. He had to account to Mr. Barrow for all principal payments during 2015 on December 31, 2015. In lieu of making the required principal payments to Mr. Barrow during 2015, Mr. Borna, at his sole discretion, could assign to Mr. Barrow Mr. Borna's interests in Zhuo Zhou Development and in a second company.

The Barrow notes generally had seven-year terms and provided for monthly payments. The Barrow notes bore a stated annual rate of interest ranging from 5% to 10.9%, and most of the Barrow notes that Mr. Borna acquired had stated interest rates of 8.9% through 10.9%. Payments on the Barrow notes were applied first to any interest due, and then to principal. Mr. Barrow and Mr. Borna knew that collection action would be difficult, and at least some of the Barrow notes would never be paid in full.

Mr. Borna received payments on the Barrow notes, and he paid commissions to persons who helped collect these payments. He committed some of the payments to Zhuo Zhou Development and spent most of the payments on personal

[*9] items such as petitioners' mortgage, insurance, and credit card charges. Mr. Borna at the time of trial had not made any payments on the Borna notes.

Mr. Borna eventually turned over on-site management of Zhuo Zhou Development to Mr. Barrow. The overheated Chinese real estate market crashed, and his important contracts dissipated with the illness of the two sisters he believed were the Finance Minister's daughters, one of whom died resulting in a loss of the project and the Chinese Government's taking over Zhuo Zhou Development in 2007.

### 3. Specifics of Barrow Notes and Payments Received Thereon

The specifics of the Barrow notes and the payments that Mr. Borna received thereon are as follows.

| Exhibit #[1] | Amount | Interest rate | Date of Barrow note | Total payments received | | |
|---|---|---|---|---|---|---|
| | | | | 2004 | 2005 | 2006 |
| 1017-P | $95,000 | 6.9 | 12/19/2004 | $50,448 | -0- | -0- |
| 1040-P | 52,000 | 9.9 | 4/3/2004 | 16,819 | $15,021 | $9,466 |
| 1069-P | 20,800 | 9.9 | 8/1/2004 | 4,987 | 3,435 | 2,748 |
| 1070-P | 48,000 | 9.9 | 1/29/2004 | 20,501 | 11,213 | 13,348 |
| 1071-P | 16,000 | 9.9 | 10/21/2002 | 2,913 | 2,118 | 2,939 |
| 1072-P | 22,500 | 9.9 | 8/3/2004 | -0- | 21,531 | -0- |
| 1073-P | 32,000 | 9.9 | 7/6/2004 | -0- | -0- | -0- |
| 1074-P[2] | 52,000 | 9.9 | 10/23/2002 | 6,774 | 6,427 | 9,997 |
| 1075-P[2] | 16,800 | 9.9 | 3/3/2003 | 2,189 | 2,076 | 3,230 |
| 1076-P[2] | 176,000 | 9.9 | 9/15/2002 | 33,262 | 25,453 | 39,759 |
| 1077-P[2] | 144,000 | 8.9 | 7/31/2002 | 18,760 | 17,797 | 27,683 |
| 1078-P[2] | 101,250 | 8.9 | 7/31/2002 | 13,190 | 12,513 | 19,464 |
| 1079-P | 21,600 | 9.9 | 9/9/2004 | 8,501 | 3,825 | 3,253 |

| [*10] Exhibit # | Amount | Interest rate | Date of Barrow note | Total payments received 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| 1080-P[3] | 105,500 | 7.9 | 11/20/2002 | 8,979 | 29,516 | 15,869 |
| 1081-P[3] | 140,000 | 5.9 | 5/20/2002 | 11,915 | 39,168 | 21,059 |
| 1082-P[3] | 40,000 | 5.9 | 5/20/2002 | 3,404 | 11,191 | 6,017 |
| 1083-P[3] | 52,500 | 7.9 | 7/24/2003 | 4,468 | 14,688 | 7,897 |
| 1084-P[3] | 20,000 | 5.9 | 5/20/2002 | 1,702 | 5,595 | 3,008 |
| 1085-P[3] | 290,000 | 5.9 | 7/1/2002 | 24,680 | 81,135 | 43,621 |
| 1086-P[3] | 296,000 | 10.9 | 2/27/2004 | 25,191 | 82,814 | 44,524 |
| 1087-P[3] | 158,000 | 5.9 | 2/25/2002 | 13,446 | 44,205 | 23,766 |
| 1088-P | 296,000 | 10.9 | 2/27/2004 | 33,287 | 10,829 | 13,536 |
| 1089-P | 30,490 | 9.9 | 11/14/2004 | 30,724 | -0- | -0- |
| 1090-P | 18,000 | 9.9 | 10/27/2003 | 6,238 | 2,681 | 2,979 |
| 1091-P | 28,000 | 9.9 | 9/21/2004 | 15,256 | 10,128 | 8,937 |
| 1092-P | 22,000 | 9.9 | 6/15/2004 | 8,640 | 4,872 | 3,542 |
| 1093-P | 17,600 | 9.9 | 6/15/2004 | 3,820 | 3,000 | 2,913 |
| 1094-P | 20,000 | 9.9 | 8/19/2004 | 4,162 | 2,648 | 2,643 |
| 1095-P | 17,600 | 9.9 | 8/04/2004 | 6,661 | 2,912 | 2,913 |
| 1096-P | 16,000 | 9.9 | 7/14/2004 | 2,959 | 15,000 | -0- |
| 1097-P | 17,500 | 8.9 | 9/12/2004 | -0- | -0- | -0- |
| 1098-P[4] | 12,000 | 9.9 | 2/16/2003 | -0- | 4,431 | 2,991 |
| 1099-P | 14,000 | 9.9 | 4/09/2003 | 3,081 | 2,085 | 2,549 |
| 1100-P[4] | 14,400 | 9.9 | 5/11/2003 | 7,646 | 5,317 | 3,589 |
| 1101-P[5] | 59,500 | 8.9 | 7/27/2004 | 25,263 | 9,631 | 9,631 |
| 1102-P[5] | 28,000 | 9.9 | 7/27/2004 | 11,888 | 4,532 | 4,532 |
| 1103-P | 296,000 | 10.9 | 2/27/2004 | 32,397 | 34,771 | 18,973 |
| 1104-P[6] | 36,000 | 9.9 | 5/7/2004 | 10,277 | 14,206 | 9,470 |
| 1105-P[6] | 12,000 | 9.9 | 5/7/2004 | 3,426 | 4,735 | 3,157 |
| 1106-P | 29,000 | --- | 8/22/2004 | 28,105 | -0- | -0- |
| 1107-P | 20,000 | 9.9 | 4/24/2004 | 13,258 | 1,589 | 3,641 |
| 1108-P | 18,000 | 9.9 | 11/28/2003 | 5,504 | 2,419 | 2,719 |
| 1109-P | 28,000 | 9.9 | 9/21/2004 | 12,366 | 3,336 | 3,290 |
| 1110-P | 16,000 | 9.9 | 7/6/2004 | 4,957 | 1,849 | 2,905 |
| 1111-P | 15,200 | 9.9 | 6/15/2004 | 4,252 | 2,541 | 2,012 |
| 1112-P | 24,000 | 9.9 | 7/6/2004 | 8,224 | 3,212 | 4,005 |
| 1113-P[7] | 44,000 | 9.9 | 3/22/2003 | 5,223 | 4,944 | 3,860 |
| 1114-P[7] | 30,000 | 9.9 | 3/22/2003 | 3,561 | 3,371 | 2,632 |

| [*11] Exhibit # | Amount | Interest rate | Date of Barrow note | Total payments received 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| 1115-P | 20,800 | 9.9 | 3/26/2004 | 21,139 | -0- | -0- |
| 1116-P | 40,000 | 9.9 | 7/9/2005 | -0- | 40,213 | -0- |
| 1117-P | 45,000 | 7.9 | 3/6/2005 | -0- | 62,493 | -0- |
| 1118-P | 49,500 | --- | 7/15/2005 | -0- | 49,746 | -0- |
| 1119-P | 15,000 | 6.9 | 4/9/2005 | -0- | 16,861 | 2,031 |
| 1120-P | 35,000 | 9.9 | 6/5/2005 | -0- | 36,707 | -0- |
| 1121-P | 105,000 | 7.9 | 4/22/2005 | -0- | 42,735 | -0- |
| 1122-P | 17,600 | 9.9 | 4/24/2004 | 5,212 | 3,962 | 3,508 |
| 1123-P | 15,200 | 9.9 | 7/24/2003 | -0- | 600 | 2,000 |
| 1124-P | 45,000 | 7.9 | 7/22/2005 | -0- | 31,138 | -0- |
| 1125-P | 30,000 | 9.9 | 2/22/2005 | -0- | -0- | -0- |
| 1126-P[8] | 30,000 | 9.9 | 2/22/2005 | -0- | 30,647 | 3,406 |
| 1127-P | 29,600 | 9.9 | 10/18/2004 | 980 | 8,000 | 8,000 |
| 1128-P | 66,000 | 7.9 | 2/10/2005 | -0- | 51,561 | 8,203 |
| 1129-P | 71,332 | 9.9 | 5/8/2005 | -0- | 26,881 | 9,797 |
| 1130-P | 120,000 | 9.9 | 2/26/2006 | -0- | -0- | 64,100 |
| 1131-P | 35,200 | 9.9 | 1/14/2006 | -0- | -0- | 13,277 |
| 1132-P | 21,600 | 9.9 | 9/2/2004 | 7,500 | 4,397 | 3,968 |
| 1133-P | 80,000 | 9.9 | 2/26/2006 | -0- | -0- | 29,768 |
| 1134-P | 52,000 | 9.9 | 11/20/2005 | 31,080 | 13,350 | 3,528 |
| 1135-P | 28,000 | 9.9 | 3/6/2005 | -0- | 10,075 | 4,634 |
| 1136-P | 36,000 | | 12/20/2006 | -0- | -0- | 6,300 |
| 1137-P | --- | --- | --- | -0- | -0- | -0- |
| 1138-P | 15,600 | 9.9 | 6/15/2004 | 5,864 | 1,549 | 2,582 |
| 1139-P | 30,000 | 9.9 | 2/27/2005 | -0- | 14,586 | -0- |
| 1140-P | 19,000 | --- | 6/26/2004 | 18,617 | -0- | -0- |
| 1141-P[8] | 75,000 | 6.9 | 2/12/2005 | -0- | 76,619 | 8,515 |
| 1142-P | --- | --- | --- | -0- | -0- | -0- |
| 1143-P | 14,000 | 9.9 | 10/23/2003 | 2,549 | 2,317 | 2,317 |
| 1144-P | 14,800 | 9.9 | 1/10/2004 | 1,788 | 779 | -0- |
| 1145-P | 20,000 | 9.9 | 1/15/2004 | -0- | -0- | -0- |
| 1146-P | 14,400 | 9.9 | 6/18/2003 | 1,501 | 1,703 | 238 |
| 1147-P | 21,600 | 9.9 | 11/28/2004 | 1,787 | 20,681 | 2,134 |
| 1148-P | 16,000 | 9.9 | 10/4/2003 | 3,111 | 842 | 265 |
| 1149-P | 52,000 | 9.9 | 5/10/2004 | 16,747 | 9,466 | 8,606 |

| **[*12]** Exhibit # | Amount | Interest rate | Date of Barrow note | Total payments received | | |
|---|---|---|---|---|---|---|
| | | | | 2004 | 2005 | 2006 |
| 1150-P | 20,000 | 9.9 | 6/10/2003 | 5,641 | 5,726 | 6,508 |
| 1151-P | 14,400 | 9.9 | 5/22/2003 | 3,092 | 1,971 | 2,383 |
| 1152-P[9] | 27,500 | 6.9 | 7/15/2002 | 4,634 | 4,634 | 4,634 |
| 1153-P[9] | 19,500 | 6.9 | 7/26/2002 | 3,286 | 3,286 | 3,286 |
| 1154-P | 13,200 | 9.9 | 6/17/2003 | 2,750 | 2,500 | 3,500 |
| 1155-P | 16,400 | 9.9 | 8/23/2003 | 3,023 | 2,212 | 2,248 |
| 1156-P | 13,600 | 9.9 | 5/17/2003 | 2,264 | 1,814 | 2,503 |
| 1157-P | 15,000 | 9.9 | 10/21/2002 | 2,248 | 1,664 | 2,823 |
| 1158-P | 14,000 | 8.9 | 4/4/2004 | 8,018 | 1,796 | 2,021 |
| 1159-P | 20,800 | 9.9 | 3/26/2004 | 1,750 | 2,450 | 3,450 |
| 1160-P | 12,000 | 9.9 | 10/28/2002 | 993 | -0- | -0- |
| 1161-P[10] | 29,600 | 9.9 | 7/23/2002 | 5,378 | 3,419 | 2,441 |
| 1162-P[10] | 40,000 | 9.9 | 9/15/2002 | 7,267 | 4,620 | 3,298 |
| 1163-P | 16,000 | 9.9 | 8/5/2002 | 3,005 | 1,989 | 2,498 |
| | | | | [11]34,528 | 1,180,749 | 643,837 |

[1]We list the Barrow notes by exhibit number rather than by issuer name because the identities of the issuers are not relevant to our analysis.

[2]As to the Barrow note in Exhibit 1076-P, Mr. Borna received payments of $10,333, $3,702, and $5,924 in the respective years in issue. In addition, as to the five Barrow notes in Exhibits 1074-P through 1078-P, Mr. Borna received other payments totaling $63,842, $60,564, and $94,209 in the respective years in issue. The record, however, does not allow us to find the specific portions of those other payments that apply to each of the notes. We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[3]As to the eight Barrow notes in Exhibits 1080-P through 1087-P, Mr. Borna received payments totaling $93,785, $308,312, and $165,761 in the respective years in issue. The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes. We apportion the total other payments for each

[*13] year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[4]As to the two Barrow notes in Exhibits 1098-P and 1100-P, Mr. Borna received payments totaling $9,748 and $6,580 in 2005 and 2006, respectively.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[5]As to the two Barrow notes in Exhibits 1101-P and 1102-P, Mr. Borna received payments totaling $37,151, $14,163, and $14,163 in the respective years in issue.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[6]As to the two Barrow notes in Exhibits 1104-P and 1105-P, Mr. Borna received payments totaling $13,703, $18,941, and $12,627 in the respective years in issue.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[7]As to the two Barrow notes in Exhibits 1113-P and 1114-P, Mr. Borna received payments totaling $8,784, $8,315, and $6,492 in the respective years in issue.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[*14]        [8]As to the two Barrow notes in Exhibits 1126-P and 1141-P, Mr. Borna received payments totaling $107,266 and $11,921 in 2005 and 2006, respectively.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[9]As to the two Barrow notes in Exhibits 1152-P and 1153-P, Mr. Borna received payments totaling $7,920 in each of the years in issue.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[10]As to the two Barrow notes in Exhibits 1161-P and 1162-P, Mr. Borna received payments totaling $12,645, $8,039, and $5,739 in the respective years in issue.  The record, however, does not allow us to find the specific portions of those payments that apply to each of the notes.  We apportion the total other payments for each year among the notes in accordance with the ratio that the amount of each note bears to the total amount of these notes.

[11]Our rounding of the individual payments for 2004 has resulted in the total payments' being $2 greater than they actually were.


D.  <u>Rental Income</u>

During all three of the taxable years in issue, petitioners received rent from various persons for property they leased to those persons.  Petitioners deposited the rent into the Land Bank accounts discussed <u>infra</u>.

[*15] III.  Bank Accounts

A.  Bank of America Accounts 7874 and 8887

Mr. Borna owned and controlled Land Bank accounts at Bank of America ending in 7874 and 8887 (account 7874 and account 8887, respectively).[6]  All receipts from sales in the name of Mr. Borna, all moneys that Mr. Borna received on the Barrow notes, and all rent that Mr. Borna received were deposited into account 7874 (or starting about February 10, 2006, into account 8887).

Mr. Borna was responsible for the Land Bank check register.  He retrieved the statements and looked at them to see whether checks had cleared.  He or someone else made the deposits.

B.  Bank of the Sierra Account 9280

During 2006, Mr. Borna owned and controlled an account at Bank of the Sierra ending in 9280 (account 9280).

C.  CitiBank Account 6516

Mrs. Borna received wages from an independent employer, Macy's, Inc., during each year in issue.  Those wages, net of certain amounts withheld (including $48 in 2006 for a contribution to the United Way) were deposited into her CitiBank account ending in 6516 (account 6516).

---

[6]At least once, the trial transcript refers incorrectly to the latter account as account number 2887.

**[\*16]** D.  Accounts 1692 and 2484

Superb Properties maintained two accounts at Mojave Desert Bank.  These accounts ended in numbers 1692 and 2484 (account 1692 and account 2484, respectively).

IV.  Preparation of the Subject Returns

Solis Cooperson's firm prepared the subject returns.  Each subject return included, among other forms and schedules, a Schedule C, Profit or Loss From Business, and a Schedule D.

Mr. Borna understood that he and his wife signed the subject returns under penalty of perjury and were responsible for their accuracy.  Mr. Borna did not review the subject returns.  Petitioners did not give Mr. Cooperson all of the relevant documents (e.g., all of the notes and deeds of trust) related to the Borna note transactions before the preparation of the subject returns.

V.  Audit

A.  Overview

Respondent began auditing the 2004 return and later expanded the audit to include the 2005 return and the 2006 return.  Respondent's revenue agent, Daniel Huh, met on various occasions with Mr. Cooperson in his capacity as petitioners' representative.

**[*17]** During the audit petitioners did not give Mr. Huh everything that he requested from them, in part because that many of petitioners' business and tax returns were lost as a result of a series of burglaries of Land Bank's and Superb Properties' offices and storage locations and of petitioners' personal residence in California City. Included in the lost property were two computers that stored business records. Mr. Huh eventually issued bank summonses and multiple information document requests to get information that he sought.

Since the audit and after the issuance of the notice of deficiency, petitioners' attorney's accounting assistant, Ms. Wang, has made a yeoman's effort to reconstruct petitioners' records primarily utilizing copies of petitioners' canceled checks obtained from Mr. Borna's and his businesses' banks. This effort has been both arduous and tiring because of the number of transactions at issue, the fact that many checks did not identify the reason for the check on the memo line, and the passage of time. Consequently, many alleged expenses and income items remain in dispute although the parties have tried hard to resolve as many substantiation issues as possible, with some success.

[*18] B. <u>Bank Deposits Analysis</u>

    1. <u>Analysis During Audit</u>

Mr. Huh prepared the following bank deposits analysis (BDA) to reconcile petitioners' bank deposits to the income reported on the subject returns.

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| Net deposits from account 1692 | $217,843 | $546,880 | $416,930 |
| Net deposits from account 2484 | 112,698 | 44,568 | 13,900 |
| Net deposits from account 7874 | 1,263,604 | 3,033,599 | 545,388 |
| Net deposits from account 6516 | 38,399 | 46,081 | 39,138 |
| Net deposits from account 8887 | -0- | -0- | 1,033,139 |
| Net deposits from account 9280 | -0- | -0- | 36,245 |
|   Total net deposits | 1,632,544 | 3,671,128 | [1]2,084,739 |
| | | | |
| Escrow deposits | 197,013 | 443,026 | 251,583 |
| Gross receipts per Schedules C | 201,493 | 217,612 | 414,197 |
| Installment sales interest per tax returns | 62,907 | 105,217 | 146,382 |
| State tax refund per tax returns | 2,673 | -0- | -0- |
| Rents received per tax returns | 34,923 | 31,387 | 64,280 |
| Ms. Borna's net wages per tax returns | 37,901 | 36,772 | [2]38,780 |
| Installment sales payments received per tax returns (excluding interest income) | 495,568 | 53,436 | 327,650 |
|   Total reductions | 1,032,478 | 887,450 | [1]1,242,871 |
|    Unexplained deposits | 600,066 | [1]2,783,679 | 841,868 |
| | | | |
| Additional Schedule D gross sales | 319,500 | 1,055,000 | 352,000 |
| | | | |
| Additional Schedule C gross receipts | 280,566 | 1,728,679 | 489,868 |

[1]We note a discrepancy of $1.

[*19]      [2]Mr. Huh improperly included the $48 contribution in this amount.  The parties should correct this error in their computations under Rule 155.

Mr. Huh requested proof of petitioners' escrow deposits for the years in issue.  Mr. Borna provided information for 2004, but not for 2005 or 2006.  Mr. Huh determined petitioners' escrow deposits for 2005 and 2006 by multiplying each year's total net deposits by the ratio of the escrow deposits for 2004 over the total net deposits for 2004.

Mr. Huh arrived at the additional Schedule C gross receipts by subtracting from the unexplained deposits the amounts that he determined were additional Schedule D sales.  As to the Schedule D sales, Mr. Huh identified the properties that Mr. Borna purchased and sold by reviewing Kern County  property transactions for 2004, 2005, and 2006 where Mr. Borna was listed as the grantee or grantor.  Mr. Huh calculated the selling and purchase prices (tax basis) by dividing the property tax paid by the property tax transfer tax rate of .11%.  Mr. Huh matched up a sale by Mr. Borna with the unreported purchase (tax basis) to establish the gain, if any, on property sold and not reported.[7]

---

[7]Mr. Huh's computations were not always accurate or carefully checked.  As a result, the Court has given them reduced credibility when weighing the evidence.

**[*20]**       2. <u>Analysis After Audit</u>

During this proceeding Revenue Agents Laura Hurtado and Sunny Lee reviewed Mr. Huh's BDA and revised it to include cash out from deposits on two accounts. Cash out represents the amount of cash that is taken out at the time of deposit. Cash out is important because some banks reflect only the net amount of the deposit on a bank statement, and a review is required to make sure that all income is actually reported.

Mr. Huh's BDA did not include any cash out. The revised BDA (revised BDA) included for the respective years in issue cash outs of $27,800, $20,273, and $13,000 for account 7874. For 2006, the revised BDA also included cash out of $8,000 for account 8887.

Ms. Hurtado and Mr. Lee in the revised BDA also adjusted the Schedule D gross sales. They listed properties that were identified as sold but not reported by Mr. Borna. They took into account amounts determined to be Mr. Borna's purchase price, the sale price, amounts received, costs incurred at the time of purchase, and the capital gain realized.

The escrow amounts in the BDA for 2005 and 2006 correspondingly changed in the revised BDA. At trial, respondent conceded an additional adjustment to acknowledge a division error by Mr. Huh in computing the selling

[*21] price, by a factor of 10 pointed out by the Court, which had resulted in a large price discrepancy as reflected on Mr. Huh's examination work papers. This error and others were apparently corrected later in the examination and the preparation of the statutory notice of deficiency. Other mathematical and/or factual errors were not corrected.

The revised BDA is as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Net deposits from account 1692 | $217,843 | $546,880 | $416,930 |
| Net deposits from account 2484 | 112,698 | 44,568 | 13,900 |
| Net deposits from account 7874 | 1,291,404 | 3,053,872 | 558,388 |
| Net deposits from account 6516 | 38,399 | 46,081 | 39,138 |
| Net deposits from account 8887 | -0- | -0- | 1,041,139 |
| Net deposits from account 9280 | -0- | -0- | 36,245 |
| Total net deposits | 1,660,344 | 3,691,401 | [1]2,105,739 |
| Escrow deposits | 197,013 | 438,013 | 249,862 |
| Gross receipts per Schedules C | 201,493 | 217,612 | 414,197 |
| Installment sales interest per return | 62,907 | 105,217 | 146,382 |
| State tax refund per tax returns | 2,673 | -0- | -0- |
| Rents received per tax returns | 34,923 | 31,387 | 64,280 |
| Ms. Borna's net wages per tax returns | 37,901 | 36,772 | 38,780 |
| Installment sales payments received per tax returns (excluding interest income) | 495,568 | 53,436 | 327,650 |
| Total reductions | 1,032,478 | 882,437 | 1,241,151 |
| Unexplained deposits | 627,866 | 2,808,964 | 864,588 |
| Additional Schedule D gross sales | 101,680 | 198,400 | 25,500 |
| Additional Schedule C gross receipts | 526,186 | 2,610,564 | 839,088 |

[1]We note a discrepancy of $1.

**[*22]** The parties eventually agreed to remove from the revised BDA the balances in account 1692 and in account 2484. Thus, on the basis of this agreement, respondent now asserts that the additional Schedule C gross receipts for the respective years in issue are as follows:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Additional Schedule C gross receipts | $526,186 | $2,610,564 | $839,088 |
| Net deposits from account 1692 | (217,843) | (546,880) | (416,930) |
| Net deposits from account 2484 | (112,698) | (44,568) | (13,900) |
| Total adjustment | 330,541 | 591,448 | 430,830 |
| Additional Schedule C gross receipts (as adjusted) | 195,645 | 2,019,116 | 408,258 |

## VI. Schedule C Expenses for Taxes and Licenses

Petitioners claimed on the subject returns that they were entitled to deduct for 2004, 2005, and 2006 $56,403, $681, and $697, respectively, for taxes and licenses. Respondent allowed $5,703 for 2004, and the deduction amounts claimed for 2005 and 2006. For the respective years in issue, petitioners submitted at trial negotiated checks for reported taxes and licenses expenses totaling $47,197, $96,917, and $18,584.

[*23] VII.  Schedule C Rent Expenses

Petitioners claimed on the subject returns that they were entitled to deduct for 2004, 2005, and 2006 $24,377, $24,238, and $24,369, respectively, as Schedule C rent expenses.  Respondent allowed $7,210, $7,210, and $6,089, respectively.

Petitioners did not give Mr. Huh any checks to support the deduction for rent expenses for 2004.  Therefore, Mr. Huh allowed a conservative estimate amount based on that allowed for the subsequent tax years.  For the respective years in issue, petitioners submitted at trial for rent expenses negotiated checks totaling $76,125, $43,438, and $66,564.

In 2004, Mr. Borna paid $1,600 to Aspen Investment as a reported office rental expense.  Danny Jones is associated with Aspen Investment.  A Land Bank check for $50,929 made payable to him was cashed by Danny Jones on June 14, 2006.  The check indicates that it is for "notes 4076 [and] 4079".

VIII.  Schedule C Commissions Expenses

A.  Overview

Mr. Borna paid commissions ranging from 10% to 50% for property that he owned individually and sold through Land Bank.  Petitioners paid and reported "commission and other expenses" on the Forms 6252 filed with the subject returns.  These amounts related to properties that Mr. Borna owned.  The "other expenses"

**[*24]** represented costs paid for, among other things, grading, taxes, licenses, and escrow fees. Petitioners also paid commissions and other expenses on other unreported property sales; those expenses included costs such as grading, taxes, licenses, and escrow fees.

B. 2004

For 2004, petitioners deducted $58,121 as Schedule C commissions expenses. Respondent allowed $14,462.

Petitioners did not give Mr. Huh checks to support the claimed commissions expenses. Mr. Huh used the amounts reflected on various Forms 1099 to determine what he considered to be the commissions paid. He determined that petitioners paid $444,273 in commissions for both Schedule C and D transactions. In calculating the allowable commissions allocated to Schedule C, he considered Mr. Borna's statement that he paid 3% to 5% commissions on Schedule C sales and 20% commissions on Schedule D sales. Mr. Huh determined it was closer to 1% to 3% on Schedule C sales and allowed 3%. He multiplied his determination of Schedule C gross receipts as adjusted by 3%, resulting in $14,462. He determined the total of petitioners' Schedule D sales per his calculations and allowed Schedule D commissions based on 20%. For 2004, the amount he allowed for Schedule D was $429,811.

**[*25]** C. <u>2005</u>

For 2005, petitioners deducted $100,811 as Schedule C commissions expenses. Respondent allowed $58,389.

Mr. Huh determined that petitioners paid $508,103 in commissions for both Schedules C and D. In calculating the allowable commissions allocated to Schedule C, Mr. Huh used petitioners' accounting records and Mr. Cooperson's statements. Mr. Huh allowed 3% for Schedule C sales per his calculations. Mr. Huh multiplied the Schedule C gross receipts as adjusted by him by 3%, resulting in $58,311. Mr. Huh determined the total of petitioners' Schedule D sales per his calculations and allowed Schedule D commissions based on 20%. For 2005, the amount of commissions allowed for Schedule D is $449,714.

D. <u>2006</u>

Petitioners deducted $376,697 as Schedule C commissions expenses. Respondent allowed $27,122.

Mr. Huh determined that petitioners paid $357,897 in commissions for both Schedules C and D. In calculating the allowable commissions allocated to Schedule C sales, Mr. Huh allowed 3% per his calculations. Mr. Huh multiplied the Schedule C gross receipts as adjusted by him by 3%, to come up with $27,122. Mr. Huh determined the total of petitioners' Schedule D sales per his calculations

[*26] and allowed Schedule D commissions based on 20%. For 2006, the amount

allowed for Schedule D was $330,775.

IX. Notice of Deficiency

The notice of deficiency lists the following adjustments:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Sch C1--Taxes and licenses | $50,700 | -0- | -0- |
| Sch C1--Rent/lease-- |  |  |  |
| Other business property | 17,167 | $17,028 | $18,280 |
| Sch C1--Commissions and fees | 43,659 | 42,422 | 349,575 |
| Sch C1--Additional sales from |  |  |  |
| Sch C properties | 280,566 | 1,728,679 | 489,868 |
| Sch D--S T Gain/Loss |  |  |  |
| Forms 6252/4684/6781/8824 | 299,000 | 674,986 | 64,290 |
| Sch E1--Rents Received | 34,923 | 31,387 | 38,105 |
| S/E AGI adjustment | (14,673) | (38,563) | (18,187) |
| Itemized deductions | 21,340 | 69,203 | 18,839 |
| Exemptions | 4,650 | 7,680 | -0- |
| Total | 737,332 | 2,532,822 | 960,770 |

X. Amended Answer

The amended answer lists the following revised adjustments:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Sch C1--Taxes and licenses | $50,700 | -0- | -0- |
| Sch C1--Rent/lease-- |  |  |  |
| Other business property | 17,167 | $17,028 | $18,280 |
| Sch C1--Commissions and fees | 36,291 | 15,966 | 339,099 |
| Sch E1--Rents received | 34,923 | 31,387 | 38,105 |
| Sch C1--Additional sales from |  |  |  |
| Sch C properties | 526,186 | 2,610,564 | 839,088 |
| Capital gain or loss | 68,667 | 141,597 | 100,283 |

[*27]

|  | | | |
|---|---|---|---|
| S/E AGI adjustment | (13,860) | (40,979) | (21,862) |
| Itemized deductions | 21,602 | 69,203 | 26,260 |
| Exemptions | 4,650 | 7,680 | -0- |
| Total | 746,326 | 2,852,446 | 1,339,253 |

OPINION

I. Perception of Mr. Borna and Mr. Huh and of Certain Exhibits

A. Mr. Borna

Mr. Borna testified at length. The Court did not perceive him to be entirely credible, and we consider portions of his testimony to be unreliable. We are not required to rely on unreliable testimony, and we do not consider aspects of his testimony sufficiently reliable to establish petitioners' positions with respect to certain of the issues at hand. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 84-87 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), aff'g per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), aff'g in part and remanding T.C. Memo. 1957-129.

Nor do we rely on the principal vis-a-vis interest allocations that petitioners set forth in various payment schedules that they offered into evidence to characterize sole proprietorship receipts (or portions thereof) as nontaxable returns of principal. We consider those documents to be untrustworthy. For example, as

**[\*28]** to one of the schedules, Exhibit 1181-P, Mr. Borna helped prepare the entries in that exhibit contemporaneously with the trial in this case; and as discussed <u>supra</u>, we find that his testimony (which includes his statements as to the accuracy of the exhibit) is unreliable. We also have further reservations as to the accuracy of that exhibit in that, as discussed <u>infra</u>, we find that petitioners' bookkeeping was substandard. We also note that Mr. Borna's testimony and overall understanding of the amount of principal that he received vis-a-vis the amount of interest that he received has not always been consistent.

B. <u>Mr. Huh</u>

Mr. Huh also testified extensively at the trial. The Court's impression of his testimony and audit efforts was that he was annoyed with the status of petitioners' books and records and lack thereof. He was more interested in the burden of proof than in determining the correct amount of tax even when, because of his efforts and bank deposits methodology, canceled checks and other documents were available to assist him in determining allowable deductions. Further, he made computations which had to be corrected by other Internal Revenue Service personnel, including Revenue Agents Laura Hurtado and Sunny Lee, at the request of respondent's

[*29] counsel.  We give little evidentiary weight to Mr. Huh's testimony and, except to the extent stated herein, to his work product.[8]

II.  Burden of Proof

A.  General Rules

The Commissioner's determinations in a deficiency notice are generally presumed correct, and taxpayers generally bear the burden of proving those determinations wrong.  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The Court of Appeals for the Ninth Circuit, to which an appeal of this case ordinarily would lie, absent a stipulation to the contrary, has held that the presumption of correctness attaches to a notice of deficiency in unreported income cases only when the Commissioner establishes a minimal evidentiary foundation linking the taxpayer to the source of the unreported income.  See Palmer v. U.S. IRS, 116 F.3d 1309, 1312-1313 (9th Cir. 1997); Weimerskirch v. Commissioner, 596 F.2d 358, 360-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977).  Once such a foundation is established, the burden shifts to the taxpayer to prove by a preponderance of the evidence the portion of the unreported income that is not taxable.  See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97; Palmer, 116 F.3d at 1312-1313; see also Helvering v.

---

[8]We note, however, that we agree with Mr. Huh's conclusion that petitioners failed to report significant amounts of income that Mr. Borna's businesses realized.

**[*30]** <u>Taylor</u>, 293 U.S. 507, 515 (1935); <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 76-77 (1986).

Respondent determined that petitioners failed to report certain items of income, and the evidence at hand establishes a minimal evidentiary foundation linking petitioners to the source of that unreported income. The primary source for the unreported income is Mr. Borna's sole proprietorship. We conclude that petitioners bear the burden of proof as to the deficiencies determined in the notice of deficiency. Our conclusion applies to both the unreported income and to the disallowed deductions underlying those deficiencies.[9]

B. <u>Section 7491(a)</u>

Section 7491(a)(1) provides an exception to the general rules on burden of proof by shifting the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain conditions.[10] These conditions require in part that individual taxpayers establish that they

---

[9]Respondent in the amended answer asserts that petitioners are liable for deficiencies in amounts greater than the amounts determined in the notice of deficiency. While respondent bears the burden of proof as to any increased deficiency, <u>see</u> Rule 142(a)(1), we do not find any increased deficiency in this case.

[10]Sec. 7491(a)(1) generally provides that "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue."

**[\*31]** complied with the substantiation requirements set forth in the Code, that they maintained all records required by the Code, and that they cooperated fully with the Commissioner's reasonable requests for, among other things, information and documents.  See sec. 7491(a)(2);[11] Estate of Dieringer v. Commissioner, 146 T.C. 117, 127-128 (2016).

We hold that section 7491(a) does not apply to shift the burden of proof to respondent.  This is because we do not find that petitioners cooperated with respondent's reasonable requests for documents and information or that petitioners established their compliance with the substantiation and recordkeeping requirements of the Code.  Petitioners assert that they fully cooperated with Mr. Huh throughout the audit, that they answered all of his questions, and that they gave him all of the documents that he requested (except to the extent of certain documents which petitioners claim were stolen).  We disagree on each of these points.  The record establishes, and we find as facts, that petitioners did not cooperate with Mr. Huh, that petitioners did not give Mr. Huh all of the documents that he requested (e.g., Mr. Huh was required to get a significant amount of

_____

[11]Sec. 7491(a)(2) provides that the general rule of sec. 7491(a)(1) applies to an individual taxpayer only if "the taxpayer has complied with the requirements under this title to substantiate any item; * * * [and] the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".

[*32] information directly from third parties), and that petitioners did not timely supply Mr. Huh with all of the information that he requested.

III.  Unreported Income

A.  Overview

Gross income includes all income from whatever source derived, including gross income derived from business.  See sec. 61(a)(2).  This definition sweeps broadly to reach all accessions to wealth over which a taxpayer has complete control.  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  A taxpayer's receipt of an item of income "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it", and a taxpayer has dominion and control of the item when the taxpayer is free to use the item at will.  Rutkin v. United States, 343 U.S. 130, 137 (1952).  A taxpayer's use of funds for personal purposes indicates dominion and control, even if those funds are in an account titled in someone else's name.  See, e.g., Gardner v. Commissioner, T.C. Memo. 2013-67, at *13.

Taxpayers are required to maintain books and records sufficient to establish the amount of their gross income.  See sec. 6001.  When taxpayers fail that requirement, the Commissioner may reconstruct their income using any reasonable method.  See Holland v. United States, 348 U.S. 121, 130-131 (1954); see also

**[\*33]** <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991) ("The use of the bank

deposits method for computing income has long been sanctioned by the courts."),

<u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992).

The record establishes, and we find, that petitioners failed to maintain the

requisite books and records as to Mr. Borna's sole proprietorship or to properly

reconstruct any stolen records. See <u>Gizzi v. Commissioner</u>, 65 T.C. 342, 346

(1975) (noting that taxpayers whose records are lost on account of a casualty are

required to reasonably reconstruct their missing records). We conclude, therefore,

that respondent properly undertook a BDA to determine petitioners' income and

that respondent properly determined through this BDA that petitioners

underreported their income for the years in issue. A BDA is a reasonable method

of reconstructing income, and the Commissioner may rely on a BDA to reconstruct

a taxpayer's income where the taxpayer failed to maintain sufficient records. See

<u>Nicholas v. Commissioner</u>, 70 T.C. 1057, 1064 (1978). Bank deposits are

considered prima facie evidence of a taxpayer's receipt of taxable income. See

<u>Parks v. Commissioner</u>, 94 T.C. 654, 658 (1990) (citing <u>Tokarski v.

Commissioner</u>, 87 T.C. 74, 77 (1986)).

After the Commissioner reconstructs a taxpayer's income and determines a

deficiency, as he has done here, the taxpayer bears the burden of proving that the

**[\*34]** use of the BDA was unfair or inaccurate. See Clayton v. Commissioner, 102 T.C. 632, 645 (1994). The taxpayer may do so by showing (among other things) that certain deposits came from nontaxable sources. See id. Nontaxable sources include funds attributable to interaccount bank transfers and returned checks, as well as "loans, gifts, inheritances, or assets on hand at the beginning of the taxable period." Burgo v. Commissioner, 69 T.C. 729, 743 n.14 (1978) (quoting Troncelliti v. Commissioner, T.C. Memo. 1971-72); see also Clayton v. Commissioner, 102 T.C. at 645-646.

### B. Sole Proprietorship Income

Respondent asserts that petitioners failed to report sole proprietorship income for each year in issue. According to the amended answer, as adjusted to reflect the parties' agreement as to the deposits into accounts 1692 and 2484, petitioners' unreported sole proprietorship income for the respective years in issue totals $195,645, $2,019,116, and $408,258.

Petitioners argue that most of the unreported deposits are not taxable income to them because, they assert, those deposits represent the payment of principal on the Barrow notes. According to petitioners, the principal payments represent a dollar-for-dollar return in the basis that Mr. Borna received in the Barrow notes

[*35] through his issuance of the Borna notes.[12]  We disagree with petitioners'

argument.  We do not find that all of the disputed amounts are a return of basis, as

petitioners claim.

Mr. Borna received numerous payments on the Barrow notes, and those

payments are naturally characterized as principal or interest.  Stated interest is

computed from the stated interest rates in the Barrow notes.  Petitioners, as cash

basis taxpayers, must recognize all interest that Mr. Borna received on the Barrow

notes, see sec. 61(a)(4), notwithstanding what his bases may be in those notes.

Respondent asserts on brief that petitioners received unreported stated

interest for the respective years in issue of $33,480, $69,327, and $57,586.  We

have reviewed respondent's calculations underlying those amounts and note further

that petitioners have not, in their answering brief, specifically identified any error

in the mechanics of those calculations.  We sustain respondent's position that

petitioners failed to recognize for each year in issue stated interest from Mr.

Borna's sole proprietorship.  We also sustain respondent's calculations of the

amounts of unreported stated interest, except to the extent that the numbers in

respondent's calculations would change on account of our findings of fact, which

we set forth supra section II.C.3 (pp. 9-11), or our holding as to respondent's

_____

[12]In this vein, petitioners assert, the deposits are not receipts of Mr. Borna's
sole proprietorship but are receipts from the sale of capital assets.

**[\*36]** asserted prepayments, discussed <u>infra</u> p. 38. To the extent that those numbers would change on account of those findings and holding, we direct the parties, in their Rule 155 computations, to recalculate the amounts in accordance with our findings of fact <u>supra</u> section II.C.3 (pp. 9-11) and holding <u>infra</u> p. 38.

Section 483 generally imputes interest to a contract for the sale or exchange of property if the contract has "total unstated interest", sec. 483(a), and unstated interest is not a part of a purchaser's basis in the property, <u>see</u> sec. 1.483-1(a)(2)(i), Income Tax Regs. As relevant here, section 483 applies to such a contract if the contract provides for deferred payments and the total payments due under the sales contract are equal to or less than $250,000. <u>See</u> secs. 483(c), (d), 1274(c)(3). If section 483 applies, a portion of the total unstated interest is imputed to each deferred payment of principal. <u>See</u> sec. 483(a). Section 483(b) requires that certain deferred payments be discounted to present value in order to ascertain whether there is total unstated interest and, therefore, whether section 483 applies. Section 483(b) and (c) requires that total unstated interest be computed by discounting deferred payments under the method required by section 1274(b)(2) and by using discount rates tied to the applicable Federal rate (AFR).[13] The amount of each note's unstated interest is generally the difference between its

---

[13]The AFRs are published each month as revenue rulings in the Internal Revenue Bulletins.

[*37] stated principal amount and the present value of the payments due thereunder as determined under section 1.483-2, Income Tax Regs.

Petitioners argue that Mr. Borna received a dollar-for-dollar basis in the Barrow notes on account of his issuance of the Borna notes. We disagree. The Borna notes lacked any stated interest and thus had unstated interest under section 483 and section 1.483-2, Income Tax Regs. The amount included in basis on account of a promissory note issued to acquire nonpublicly traded property such as the Barrow notes is the stated principal amount of the note, reduced by any unstated interest. See sec. 1.1012-1(g)(1), Income Tax Regs. Mr. Borna's basis in each Barrow note thus equals the corresponding Borna note's stated principal amount less unstated interest. See id.

Respondent asserts on brief that petitioners received market discount income for the respective years in issue of $142,421, $277,099, and $203,031, an assertion due in part to the fact that the Borna notes did not provide for any interest. We have reviewed respondent's calculations underlying those amounts and note further that petitioners have not in their answering brief specifically identified any error in the mechanics of those calculations. For the reasons stated above, we sustain respondent's position that petitioners failed to recognize for each year in issue market discount income from Mr. Borna's sole proprietorship. We also sustain

**[*38]** respondent's calculations of the amounts of market discount income, except to the extent that the numbers in respondent's calculations would change on account of our findings of fact, which we set forth supra section II.C.3 (pp. 9-11), or our holding as to respondent's asserted prepayments, discussed immediately below. To the extent that those numbers would change on account of those findings and holding, we direct the parties, in their Rule 155 computations, to recalculate the amounts in accordance with our findings of fact in the just-referenced pages.

Respondent also asserts that petitioners must recognize certain payments that third parties made to Mr. Borna after certain Borna notes were issued but before the "start date" of those notes. More specifically, respondent asserts, petitioners must recognize for the respective years in issue $220,184, $138,875, and $59,200. We disagree. To the extent that third parties paid Mr. Borna amounts before a note's start date, we find and hold that those payments are prepayments made on the corresponding notes. We therefore reject respondent's position that petitioners failed to recognize these payments as income (except to the extent that the payments would be stated or unstated interest within the realm of our discussion of those items supra). We direct the parties, in their Rule 155 computations, to reflect this holding consistently with that discussion.

[*39] Finally, respondent asserts that petitioners must recognize short-term capital gain with respect to six Barrow notes (notes 1089-P, 1115-P, 1118-P, 1120-P, 1126-P, and 1141-P) that respondent asserts were paid off shortly after Mr. Borna acquired them. We agree with respondent that petitioners realized short-term capital gains to the extent that our findings of fact, which we set forth supra section II.C.3 (pp. 9-11), and our holding as to respondent's asserted prepayments, discussed supra p. 38, establish as to each note respectively that petitioners received principal payments on the note in excess of Mr. Borna's basis in the note. Mr. Borna's basis in each note equals the present value of the note. We direct the parties, in their Rule 155 computations, to reflect this holding consistently with our discussion herein.

## C. Schedule D Income

### 1. Background

The parties agree that petitioners received and failed to report Schedule D income. This income stems from additional sales of property that petitioners personally owned. The parties have settled all issues as to this matter except for four items. We address these items seriatim.

**[*40]**        2. <u>Items in Dispute</u>

a. <u>$1,000 Sales Expense</u>

The parties dispute whether petitioners may deduct a $1,000 sales expense in connection with the sale of a parcel of Kern County, California, property (referred to as APN 294-010-01) for $10,000 in 2004. Petitioners did not report this sale on their tax return because they believed no gain was realized. Petitioners originally claimed sales expenses of $2,650.

Petitioners failed to adduce any credible evidence on this issue, and the record does not otherwise persuade us that petitioners are entitled to deduct the $1,000 in dispute. We hold for respondent on this issue on the basis of petitioners' failure to meet their burden of proof.[14]

b. <u>Amounts Received in Connection With Certain Sales</u>

In or before 2003, petitioners purchased properties referred to as APN 212-251-18, APN 203-168-01, APN 203-166-02, and APN 203-166-03. They sold the properties in 2004, but the buyers rescinded the sales in 2005. Petitioners argue that rescission of the sales means that they did not realize any income on the sales. We disagree.

---

[14]Respondent's opening brief sets forth no assertion that petitioners did not realize any portion of the $10,000 in proceeds as gain. We therefore do not consider that issue.

**[\*41]** Tax liability is generally based on transactions that occur during the taxable year, without regard to transactions in later years. See Security Flour Mills, Co. v. Commissioner, 321 U.S. 281, 285-286 (1944). In this vein, a cash method taxpayer who receives proceeds under a claim of right and without restriction as to their disposition is currently taxed on the receipt in the taxable year of receipt even if, in a later taxable year, some or all of the proceeds must be returned. See Burnet v. Sanford & Brooks Co., 282 U.S. 359, 363-364 (1931).

With respect to the referenced four sales, the sales occurred in 2004 and the rescissions occurred in 2005. Petitioners therefore, as cash basis taxpayers, must report any gain or loss on the sales for 2004. Accord Felt v. Commissioner, T.C. Memo. 2009-245, 98 T.C.M. (CCH) 372, 377 (2009), aff'd, 433 F. App'x 293 (5th Cir. 2011).

c. Repossessed Properties

On December 18, 1991, petitioners purchased properties referred to as APN 305-050-14 and APN 305-071-15. Kern County sold those properties in 2004 for back taxes of $4,250 and $1,707, respectively, that petitioners owed. Petitioners' basis in each property was $1,800.

Petitioners maintain that they did not realize any gain or loss on the county's sale of the properties. Instead, as we understand their position, they

**[*42]** sustained a loss when the county took those properties, equal to their costs for the properties. We disagree. A tax sale of property is a disposition of the property. Petitioners therefore realized a long-term capital gain of $2,450 on one of the properties ($4,250 – $1,800) and a long-term capital loss of $93 on the other property ($1,707 – $1,800).

### d. Sales Expenses and Basis for APN 302-330-35

On May 26, 2005, petitioners sold property referred to as APN 302-330-35 that they had purchased on March 2, 2005. Respondent concedes that petitioners may claim a sales expense of $15,650 and that petitioners had a basis in the sold property of $9,900. Petitioners request higher amounts as to both items. Specifically, petitioners claim a cost basis of $19,000 (apparently including $5,500 of improvements), but they provided no backup evidence; and Exhibit 1042-P would seem to disprove a commission expense above $15,650.

Although petitioners provided Exhibit 1042-P, which addressed this sales transaction, they failed to adduce any credible evidence on theses issues. Petitioners bear the burden of disproving respondent's determination as to this matter. See Rule 142(a). They have failed to do so. We conclude that petitioners are not entitled to a sales expense in excess of $15,650 or to a basis in excess of $9,900.

[*43] IV.  Sole Proprietorship Expenses

A.  Preliminary

We decide whether petitioners may deduct sole proprietorship expenses for taxes and licenses, rent and lease, and commissions and fees in amounts greater than respondent allowed.  The amounts of these expenses that petitioners reported on their tax returns and the amounts that respondent disallowed and allowed in the notice of deficiency are as follows:

| Year | Type of expense | Amount reported | Amount disallowed | Amount allowed |
|------|-----------------|-----------------|-------------------|----------------|
| 2004 | Taxes and licenses | $56,403 | $50,700 | $5,703 |
|      | Rent and lease | 24,377 | 17,167 | 7,210 |
|      | Commissions and fees | 58,121 | 43,659 | 14,462 |
| 2005 | Taxes and licenses | 681 | -0- | 681 |
|      | Rent and lease | 24,238 | 17,028 | 7,210 |
|      | Commissions and fees | 100,811 | 42,422 | 58,389 |
| 2006 | Taxes and licenses | 697 | -0- | 697 |
|      | Rent and lease | 24,369 | 18,280 | 6,089 |
|      | Commissions and fees | 376,697 | 349,575 | 27,122 |

As discussed infra, petitioners currently argue that they may deduct amounts different from those they claimed, and respondent currently concedes that petitioners may deduct amounts different from those determined in the notice of deficiency.

**[*44]** B.  <u>Substantiation of Deductions</u>

A second difficulty here is that the record before us falls short of providing adequate substantiation for all of petitioners' costs.  Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms."  <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934); <u>see also</u> Rule 142(a).  The applicable section here, section 162(a), generally allows "a deduction [for] all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  An expense is ordinary if it is "normal, usual, or customary" within a particular trade, business, or industry.  See <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business.  See <u>Commissioner v. Heininger</u>, 320 U.S. 467, 471 (1943).  The breadth of section 162(a) is tempered by the requirement that any amount reported as a business expense must be substantiated, and taxpayers are required to maintain records sufficient therefor.  See sec. 6001; <u>Hradesky v. Commissioner</u>, 65 T.C. 87, 89-90 (1975), <u>aff'd</u>, 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.

When a taxpayer adequately establishes that he or she paid or incurred a deductible expense but does not establish the precise amount, we may in some

[*45] circumstances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of his or her own making.  See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  There must, however, be sufficient evidence in the record to provide a basis upon which an estimate may be made and to permit us to conclude that a deductible expense, rather than a nondeductible personal expense, was incurred in at least the amount allowed.  See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Three categories of expenses are in dispute for 2004, 2005, and 2006.  The categories are (1) taxes and licenses; (2) rent and lease expenses; and (3) commissions and fees expenses.  The disputes are detailed in the parties' "Third Stipulation of Settled [and Unsettled] Issues" filed by the Court's Clerk as a Stipulation of Settled Issues.  Because of a stolen computer with at least some, if not all, of the business records and somewhat shoddy overall recordkeeping, petitioners have had to report their expenses by reconstructing their records utilizing copies of their canceled checks apparently obtained from their banks.

C.  Expenses in Issue

The specific amounts in dispute per the parties' stipulation are as follows.  These amounts take into account respondent's amended answer.

**[*46]**        1. Schedule C  Business Expenses

            a. 2004

The parties have stipulated for 2004:

| Expense category | Amounts reported by petitioners | Amounts allowed per respondent | Amounts remaining in dispute |
|---|---|---|---|
| Taxes and licenses | [1]$47,197 | $15,618 | $16,373 |
| Rent/lease--Other business property | 76,125 | 14,090 | 62,034 |
| Commissions and fees | [1]249,696 | 30,654 | 211,176 |

[1]These are the amounts listed on petitioners' tally sheets. Respondent, however, asserts that these amounts include some duplicated items.  Neither the parties nor the record explains the discrepancy of $15,206 between, on the one hand, the difference of $31,579 in the total claimed taxes and licenses expense of $47,197 and the total of the amount allowed by respondent of $15,618 and, on the other hand, the amount remaining in dispute of $16,373.  The same is true as to the discrepancy of $7,866 between, on the one hand, the difference in total claimed commissions and fees expense of $249,696 and the amount allowed by respondent of $30,654 and, on the other hand, the amount remaining in dispute of $211,176.

Of the disputed taxes and licenses amount of $16,373 respondent would allow $11,655 and $2,160 as Schedule A "Other Miscellaneous Itemized Expense[s]".  The remaining disputed amount comprises seven payments made to the County Recorder Office totaling $2,558.

**[*47]** b. 2005

The parties have stipulated for 2005:

| Expense category | Amounts claimed by petitioners | Amounts allowed per respondent | Amounts remaining in dispute |
|---|---|---|---|
| Taxes and licenses | $96,917 | $105,776 | [1]$11,830 |
| Rent/lease-- Other business property | 51,226 | 15,288 | [1]28,878 |
| Commissions and fees | 316,392 | 48,684 | [1]285,432 |

[1]The table's taxes and licenses amounts are confusing since respondent allowed more than petitioners claimed. The additional amount allowed was $8,859 which does not jive with the $11,830 shown in the parties' stipulated table. The correct amount would seem to be a negative $8,859, rather than the $11,830 in the stipulated table. Nor is there an explanation for the discrepancy of $7,060 of the claimed rent/lease expense of $51,226 and the total of the amount allowed by respondent of $15,288 and the amount remaining in dispute of $28,878, which together total $44,166. Nor is there an explanation for the apparent discrepancy of $17,724 of the claimed commissions and fees of $316,392 and the total of the amount allowed by respondent of $48,684 and the amount remaining in dispute of $285,432, which together total $334,116.

**[*48]**          c. <u>2006</u>

The parties have stipulated for 2006:

| Expense category | Amounts reported by petitioners | Amounts allowed per respondent | Amounts remaining in dispute |
|---|---|---|---|
| Taxes and licenses | $18,584 | $13,936 | [1]$4,583 |
| Rent/lease--Other business property | 66,564 | 12,267 | [1]54,291 |
| Commissions and fees | 58,386 | 7,853 | 50,532 |

[1]The apparent discrepancy between the stipulated total reported taxes and licenses expenses of $18,584 and the total of the amount allowed by respondent, $13,936, and the amount remaining in dispute of $4,583, which together total $18,519, is not explained by the record. Nor is the discrepancy of $6 between the claimed rent/lease expense of $66,564 and the amount allowed by respondent of $12,267 and the amount remaining in dispute of $54,291, which together total $66,558.

     2. <u>Positions</u>

        a. <u>Taxes and Licenses</u>

           i. <u>2004</u>

Petitioners argue that they may deduct, for 2004, taxes and licenses expenses of $47,197. Petitioners presented at trial negotiated checks totaling that amount. Respondent concedes that petitioners may deduct $15,618.

[*49] The parties continue to dispute as to this year the deductibility of $16,373. The amounts and payees of the negotiated checks underlying the $16,373 are as follows:

| Check payee | Check amount |
| --- | --- |
| L.A. County Tax Collector | $2,160 |
| Kern County Tax Collector | 11,655 |
| County Recorder Office | 823 |
| County Recorder Office | 370 |
| County Recorder Office | 54 |
| County Recorder Office | 123 |
| County Recorder Office | 151 |
| County Recorder Office | 411 |
| County Recorder Office | 626 |
| Total | 16,373 |

Respondent objects to the claimed deduction of these payments on the grounds that petitioners were already allowed a $3,712 Schedule C business expense deduction for 2004 recorder fees and petitioners have not established that the $2,558 is not included in the $3,712. Given that the disputed amount is derived solely from the canceled checks used to reconstruct petitioners' records, we agree with respondent that if anything the allowed deduction here may be overgenerous.

Respondent concedes that petitioners may deduct the $2,160 and $11,655 amounts as miscellaneous itemized deductions, as opposed to deducting the amounts as a business expense. While petitioners reserved the right to try to prove

[*50] those amounts could be deducted elsewhere they failed to do so. We will allow these two amounts as miscellaneous itemized deductions.

### ii. 2005

Petitioners argue that they may deduct for 2005 taxes and licenses expenses of $96,917. Respondent concedes that petitioners may deduct $105,776. We will allow petitioners to deduct $105,776 without further comment.[15]

### iii. 2006

Petitioners argue that they may deduct for 2006 taxes and licenses expenses of $18,584. Respondent concedes that petitioners may deduct $13,936.

The parties continue to dispute as to this year the deductibility of $4,583. The $4,583 represents a check payable to the Los Angeles County Tax Collector. Respondent asserts that the $4,583 is deductible as a miscellaneous itemized deduction. While petitioners reserved the right to try to prove it could be deducted elsewhere, they fail to do so. The Court will allow this amount as a miscellaneous itemized deduction.

---

[15]In addition to the $105,776 that we allow, respondent concedes that petitioners may deduct $7,807 as a miscellaneous itemized deduction. The $7,807 represents check 8630 paid from account 7874 to the L.A. County Tax Collector. We allow this miscellaneous itemized deduction in full.

**[\*51]**                                        iv.  Analysis

Mr. Borna testified that he paid taxes on three groups of property:  property he personally owned, property he owned for sale to third parties, and property that Mr. Barrow sold to third parties.  He did not, however, identify to which of those groups each of the 10 remaining disputed checks related.

Respondent asserts that petitioners have failed to show that the amounts remaining in dispute were not already allowed as deductions.  As to the County Recorder Office payments, we agree.  Petitioners reported on their Forms 6252 "commission and other expenses".  The amounts reported included taxes and licenses.  Petitioners also incurred "commission and other expenses" on unreported sales of property, which also included taxes and licenses.  We conclude it is probable that the County Recorder Office payments were included in these deductions.  Consequently, we are not persuaded that petitioners may deduct any of those remaining disputed amounts as Schedule C expenses.

b.  Rent and Lease

i.  2004

Petitioners argue that they may deduct for 2004 rent and lease expenses of $76,125.  Petitioners presented at trial negotiated checks in the total amount of $76,125.  Respondent concedes that petitioners may deduct $14,090.

**[*52]** The parties continue to dispute as to this year the deductibility of $62,035. The $62,035 is attributable to six checks totaling that amount, payable to Aspen Investments. Five of the checks are for $1,600; the sixth check is for $54,035.

## ii. 2005

Petitioners argue that they may deduct for 2005 rent and lease expenses of $51,226. Petitioners presented at trial negotiated checks in the total amount of $51,226. Respondent concedes that petitioners may deduct $15,288.

The parties continue to dispute as to this year the deductibility of $28,878, which represents checks payable as follows:

| Payee | Amount |
|---|---|
| Allan/Daisy Paredes | $15,459 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 2,243 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,454 |
| Danny Jones ALC PSP | 1,121 |
| Legaspi | 1,875 |
| Total | 28,878 |

[*53]                              iii.  2006

Petitioners argue that they may deduct for 2006 rent and lease expenses of

$66,564.  Petitioners presented at trial negotiated checks in the total amount of

$66,564.  Respondent concedes that petitioners may deduct $12,267.

The parties continue to dispute, as to this year, the deductibility of $54,291.

The $54,291 represents checks payable as follows:

| Payee | Amount |
| --- | --- |
| Danny Jones ALC PSP | $50,928 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Danny Jones ALC PSP | 1,121 |
| Total | 54,291 |

iv.  Analysis

a.  2004

For 2004, the notation on check 8053 for $54,035 appears to be, in part,

"payoff".  Mr. Borna testified that he "rented a huge place from [Aspen

Investment] * * * for a few months * * * to hold [an] event * * * to capture the

client. * * * We invite different speakers, and they talk.  And then the people, they

come to the event.  We get their name, and we will call them.  My agent would call

them and ask them to sell – to buy property. * * * it was for the rental of * * * that

place."  The check indicates it was for "payoff net at 3235 Aspen Mall".  Mr.

[*54] Borna explained that "we give them a notation that I'm going to pay you before middle of the year, so that's why this was pay off that." This check appears not to be for rent but for a payoff of a real estate transaction. The Court concludes that the amount is excessive for an event rental and is more consistent with a note(s) payoff. Further support for this conclusion can be found in the 2006 check 1047 for $50,929, paid to Danny Jones (who is Aspen Investments), which petitioners also claim as a rent expense deduction. The notations on the check, "notes 4076 [and] 4079," indicate that it was a payment made on two notes, rather than a payment of rent. Mr. Borna did not produce a lease agreement associated with either of these large reported expenses.

An overwhelming amount of the rent expense in dispute for each year, $62,035 for 2004, $11,543 for 2005, and $54,291 for 2006, relates to Danny Jones d.b.a Aspen Investment, yet petitioners did not call him or any of his associates or employees at the trial or attempt to introduce by sworn affidavit Aspen Investments business records. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946) (noting the presumption that if produced the evidence would be unfavorable "is especially true where * * * the party failing to produce the evidence has the burden of proof"), aff'd, 162 F. 2d 513 (10th Cir. 1947).

[*55] Respondent asserts that petitioners have failed to show that the amounts remaining in dispute were not already allowed as deductions. Petitioners reported on their Forms 6252 "commission and other expenses"; the amounts reported included taxes and licenses. Petitioners also incurred "commission and other expenses" on unreported sales of property, which also included taxes and licenses. Respondent has not challenged the already-allowed deductions and has introduced no evidence that certain of the claimed rent or lease expense deductions have already been allowed.

Respondent seems to believe that petitioners must establish the negative that there is no needle in the haystack. We do not agree. If respondent believes deductions for the items were allowed under some other category, respondent should have challenged the expenses under that category as well as the expenses here or produced evidence, as he has with respect to commissions, that the expense deductions claimed here were already allowed elsewhere.

We are persuaded by petitioner's testimony, canceled checks, and the regular periodic payments for essentially similar amounts that the five checks, each for $1,600, represent rent expenses incurred in 2004; and we find no creditable evidence that these rent expenses were allowed as deductions elsewhere. Thus petitioners have carried their burden of proof, by a preponderance of the evidence,

[*56] that these payments should be, and they shall be, allowed as deductible rent expenses.

### b. 2005

The amounts remaining in dispute include seven checks to Danny Jones for $1,121. As with 2004, we are persuaded that these checks represent rent payments which are deductible and will be allowed for 2005. The balance of the unagreed rent and lease expense consists of a check for $15,459 to Allan/Daisy Paredes, two checks to Danny Jones for $2,243 and $1,454, and a check to Legaspi for $1,875. We will allow as a deductible rent expense the $2,243 check, which we conclude is a payment for two months of the $1,121 regular rent. We will not, however, allow any deduction for the $1,454 check (which Mr. Borna curtly identified as rent with no elaboration to explain the unique amounts, although asked "why?") or the $15,459 check to Allan/Daisy Paredes (which Mr. Borna identified as a "referral check"), or the $1,875 check to Legaspi which indicates it is a "referral" and may in fact be a referral fee per Mr. Borna's testimony. We conclude petitioners have failed to bear their burden of proof as to these checks. As Mr. Borna acknowledged, these checks, if deducted at all, would be deductible as commissions and fees, not as rent or lease expenses. We decide infra Mr. Borna's allowable deduction for 2005 commissions and fees.

**[*57]**                                c. 2006

The amounts remaining in dispute for 2006 include three checks to Danny Jones for $1,121 each and the aforementioned check for $50,928. As mentioned above, the notations on this check of "note 4076 [and] 4079" indicate that the check reflects payments made on two notes rather than rent. Consequently, the $50,928 amount will not be allowed. However, as with 2004 and 2005, the three checks for $1,121 will be allowed as deductible rent expenses for the same reasons discussed above.

### c. Commissions and Fees

#### i. 2004

Petitioners argue that they may deduct for 2004 commissions and fees expenses of $249,649. Petitioners presented at trial negotiated checks in the total amount of $249,696. Respondent concedes that petitioners may deduct $30,654.

The parties continue to dispute as to this year the deductibility of $211,176. The $211,176 represents 18 checks totaling $107,668, payable to Elizabeth PeCayo; 11 checks totaling $29,737, payable to Rosalinda Garcia; 11 checks totaling $18,000, payable to Gary Young; 1 check for $2,750, payable to Efinegie Ventura; 1 check for $2,250, payable to Famie Ventura; 2 checks totaling $17,145, payable to Flor De Lys Barawid; 1 check for $5,000, payable to Brian Borna;

**[*58]** 9 checks totaling $2,664, payable to Transasia real estate services for Mdelma; 1 check for $1,254, payable to Zalco Co.; 6 checks totaling $4,410, payable to David Galdamez; 4 checks totaling $19,238, payable to cash; 1 check for $260, payable to Joseph Nolan; and 1 check for $500, payable to James PeCayo.[16]  Respondent concedes that petitioners may deduct $13,738 of the checks payable to cash as a miscellaneous itemized deduction.

### ii.  2005

Petitioners argue for 2005 that they may deduct commissions and fees expenses of $316,392.  At trial, petitioners presented negotiated checks totaling $316,392.  Respondent concedes that petitioners may deduct $48,684.

The parties continue to dispute as to this year the deductibility of $285,432.  The $285,432 represents 21 checks totaling $176,909, payable to Elizabeth PeCayo; 11 checks totaling $30,823, payable to Rosalinda Garcia; 1 check for $10,000, payable to Rosalinda Lising; 7 checks totaling $27,485 payable to Lemie Ventura; 1 check for $12,030, payable to Flor De Lys Barawid; 1 check for $2,400, payable to Mel Mantuario; 2 checks totaling $3,000, payable to Robert Williams; 1 check for $2,000, payable to David Galdamez; 1 check for $405, payable to Maria

---

[16]We recognize that the checks referenced in this sentence total $210,876. The parties have not explained the $300 difference between the $211,176 and the $210,876.

**[*59]** Galdamez; 1 check for $300, payable to Marco Galdamez; 1 check for $333, payable to Mdelma; 1 check for $2,000, payable to Disnordas Sosnaski; 1 check for $10,000, payable to Paulita Tajiboy; 1 check for $739, payable to McGraw Insurance; 1 check for $250, payable to Mid Valley; 1 check for $5,860, payable to Mayiga; and 1 check for $898, payable to Al Gagnon.

### iii. 2006

Petitioners argue that they may deduct for 2006 commissions and fees expenses of $58,386. Petitioners presented at trial negotiated checks totaling $58,386. Respondent concedes that petitioners may deduct $7,853.

The parties continue to dispute for this year the deductibility of $50,532. The $50,532 represents 8 checks totaling $43,857, payable to Rosalinda Garcia; 1 check for $1,400, payable to Lemie Ventura; 1 check for $2,786, payable to Gade 1 Travel; 1 check for $1,739, payable to Gina Dancel; 1 check for $500, payable to Disnordas Sosnaski; and 1 check for $250, payable to David Galdamez.

### iv. Analysis

Petitioners have failed to show that the 2004, 2005, and 2006 items remaining in dispute are deductible as they claim. Petitioners paid and claimed deductions for "commission and other expenses" on the Forms 6252 filed with their tax returns and paid commission expenses concerning unreported property

[*60] sales (full and installment). We cannot determine whether respondent has already allowed deductions for the commissions in dispute. We find, for example, that some disputed items include payments that respondent has already allowed. Many of the payees on the checks petitioners presented at trial are the same individuals paid commissions with respect to property Mr. Borna owned and sold, both reported and unreported. These are PeCayo, David Galdamez, Rosalinda Garcia, and Flor de Lys Barawid. Likewise, numerous checks petitioners presented bear no notation as to the property to which they relate, and Mr. Borna failed to clarify that point at trial.

### 3. Other for 2004

Respondent concedes and we agree that petitioners may deduct $1,550 as legal and professional fees. This $1,550 was paid through 10 checks. Respondent also concedes that petitioners may deduct another $27,533 as a miscellaneous itemized deduction. We allow both miscellaneous itemized deductions.

## V. Accuracy-Related Penalties

Respondent determined for each year in issue that petitioners are liable for an accuracy-related penalty under section 6662(a). Respondent bears a burden of production with respect to those determinations. See sec. 7491(c); Rule 142(a)(2). Respondent may meet this burden by producing sufficient evidence indicating that

- 61 -

**[*61]** it is appropriate to impose the accuracy-related penalty on petitioners. See

Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Section 6662(a) imposes a 20% accuracy-related penalty on the underpayment of tax required to be shown on a return. Section 6662(b)(1) imposes an accuracy-related penalty on the portion of an underpayment which is attributable to negligence or to disregard of rules or regulations. Negligence includes "any failure to make a reasonable attempt to comply with the provisions" of the Code "or to exercise ordinary and reasonable care in the preparation of a[n] [income] tax return." See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." See sec. 1.6662-3(b)(1), Income Tax Regs. "'[D]isregard' includes any careless, reckless or intentional disregard of rules or regulations." See id. subpara. (2). Section 6662(b)(2) imposes an accuracy-related penalty on the portion of an underpayment which is attributable to a substantial understatement of income tax. In the case of individual taxpayers, a substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1)(A).

**[*62]** We find that respondent has met his burden of production. The record establishes, and we find, that petitioners were negligent and disregarded rules and regulations in that they failed to report significant amounts of taxable income for each year in issue, they failed to maintain adequate books and records, they failed to substantiate items properly, and they were in careless, reckless, or in intentional disregard of rules and regulations applicable to the payment of Federal income tax. Respondent also meets his burden of production to the extent that any of petitioners' understatements meets the statutory definition of a "substantial understatement".

Once the Commissioner has met the burden of production, as he has here, the taxpayer must come forward with persuasive evidence that the imposition of a penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. Petitioners made no argument in their posttrial brief that imposition of the accuracy-related penalties is inappropriate. While petitioners' attorney Mr. Cooperson prepared petitioners' 2004, 2005, and 2006 Federal income tax returns, he did this using solely the information provided by petitioners and was never consulted for any tax advice concerning the source, accuracy, or computations of the tax information petitioners provided to him. Since accurate and complete

[*63] information was not provided to the tax return preparer, petitioners, who did not even review the tax returns, had no right to rely on the prepared tax returns as being accurate and in accordance with the Code for the years in issue here. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. Consequently, we conclude that imposition of the accuracy-related penalties is not inappropriate and sustain respondent's determination that an accuracy-related penalty under section 6662(a) applies for each year in issue.

## VI. Epilogue

We have considered all arguments that the parties made and have rejected those arguments not discussed here as without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.